[No. B137494. Second Dist., Div. Four. Feb. 13, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
STEVEN GONZALES et al., Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II, IV, and V of the Discussion.

4

**COUNSEL**

Kathy M. Chavez, under appointment by the Court of Appeal, for Defendant and Appellant Steven Gonzales.

Athena Shudde, under appointment by the Court of Appeal, for Defendant and Appellant Michael Ronnie Gonzales, Jr.

Diane E. Berley, under appointment by the Court of Appeal, for Defendant and Appellant Manuel R. Jimenez.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Pamela C. Hamanaka and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**EPSTEIN, Acting P. J.**—Steven Gonzales, his cousin, Michael Ronnie Gonzales, Jr., and Manuel R. Jimenez appeal from their judgments of conviction by jury verdict of the murder of Julian Llamas during a fistfight. Manuel Jimenez shot Llamas. Steven Gonzales and Michael Gonzales were tried and convicted as aiders and abettors. (For sake of clarity, we sometimes refer to the Gonzales defendants by their first names.) Michael joins in all of Steven's arguments except for those based on intra- and inter-jurisdictional cruel and unusual punishment analysis. Jimenez joins in the arguments made by his codefendants, particularly those relating to the admission of testimony by a gang expert and cruel and unusual punishment.

In the published portion of this opinion, we address Steven's primary arguments on appeal: (1) that his conviction on the natural and probable consequences theory of aiding and abetting is not supported by sufficient evidence; and (2) that the trial court had a sua sponte duty to instruct that guilt based on the natural and probable consequences theory was dependent upon knowledge that Jimenez was armed. We are not persuaded by either argument. The factual issue of whether the aiders knew Jimenez was armed goes to whether the murder was the natural and probable consequence of the assault; it is not a separate element on which the jury had to be instructed. The evidence shows that Jimenez was armed when he approached the victim, that he pointed the gun at the victim, and that Michael shouted at him to shoot the victim during the fistfight. This is sufficient to support the conviction on the natural and probable consequences theory.

We also discuss, in the published portion of the opinion, defendants' constitutional challenges to Penal Code section 12022.53, which imposes an enhancement for aiders and abettors in gang cases. (All statutory references are to the Penal Code unless otherwise indicated.) Defendants argue the statute violates their rights to equal protection and due process and that the life sentences it requires constitute cruel and unusual punishment as applied to them. We find no constitutional violation.

In the unpublished portion of the opinion, we address defendants' challenge to the admission of testimony by an expert that gang members would necessarily be armed when traveling outside their territory and would use the gun if they were losing a fight with rivals. We conclude that the testimony regarding use of a gun was erroneously admitted, but that the error was harmless. We also discuss defendants' sentencing arguments, which are not based on the federal and state Constitutions, in this portion of the opinion. We conclude that the trial court erred in imposing an additional two-year street gang enhancement under section 186.22 on Michael and Steven because they did not personally use a firearm in the commission of the offense. Jimenez is subject to the section 186.22 enhancement because he did use a weapon. We also find merit in Michael's argument that the trial court erred in imposing an unspecified amount of direct victim restitution. We remand for resentencing as to each defendant.

### FACTUAL AND PROCEDURAL SUMMARY

We review " 'the whole record in the light most favorable to the judgment' and decide 'whether it discloses substantial evidence . . . such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' (*People* v. *Johnson* [(1980)] 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) Under this standard, the court does not ' "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." [Citation.] Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.]" (*People v. Hatch* (2000) 22 Cal.4th 260, 272 [92 Cal.Rptr.2d 80, 991 P.2d 165].)

All three defendants were members of the Little Hill street gang. At the time of the murder, Steven and Michael were 16 years old and Manuel Jimenez was 14 years old. In October 1998, when the crime was committed, Little Hill was a rival of the Happy Homes Puente street gang. On the evening of October 11, 1998, the three defendants were riding in a car with Rachel Molina, defendant Michael Gonzales's girlfriend. As they approached the intersection of Hacienda Boulevard and Don Julian Road in the City of Industry, they saw Juan Barrientos (15 years old) and Julian Llamas walking down the street. Barrientos testified that two people in the car occupied by defendants flashed Little Hill street gang signs toward Barrientos and Llamas. He claimed that he and Llamas were not street gang

members and that they responded with a gesture which meant "what's up." According to Steven Gonzales, it was Barrientos and Llamas who flashed Happy Homes Puente gang signs as the car approached.

As the car slowed to turn the corner, Jimenez and Steven got out of the car and ran toward Barrientos and Llamas. Steven intended to fight the two because he felt they had disrespected the pregnant Molina by throwing gang signs. Barrientos saw that Jimenez was carrying a gun at his side as he ran. Jimenez pointed the gun. Llamas rushed him and tried to grab the gun. Michael Gonzales parked the car several feet away and joined the fight.

There was conflicting evidence as to which defendant fought with which victim, and which group had the upper hand in the fight. But the evidence was undisputed that Jimenez shot and killed Llamas with a single shot to the head. Steven testified he did not know Jimenez had a gun.

Independent eyewitnesses Cayetano Lopez and Irene Castaneda saw the fight from their cars, which were stopped at the intersection. They testified they saw Jimenez pull the gun out during the fight and either saw the fatal shot or heard it.

All three defendants were tried and convicted of first degree murder. The jury found true special allegations under section 12022.53, subdivisions (d) and (e); that the offense was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)); and that a principal used a firearm in the commission of the offense. Each defendant was sentenced to a term of 25 years to life for the murder conviction and a second term of 25 years to life for the section 12022.53 enhancements. Each filed a timely appeal from the judgment against him.

DISCUSSION

I

Steven, joined by Michael, argues that the evidence is insufficient to sustain his conviction for aiding and abetting the murder of Llamas on the natural and probable consequences theory, because there was no evidence that he knew Jimenez was armed or intended to use a firearm in the fistfight. This argument is based on language in *People v. Prettyman* (1996) 14 Cal.4th 248, 267 [58 Cal.Rptr.2d 827, 926 P.2d 1013]. In order to place the issue in context, we begin with an examination of the principles set out in *Prettyman*.

The issue before the Supreme Court was whether a trial court has a sua sponte duty to instruct on the target crimes which the aider and abettor

assists. The court reviewed the principles of aider and abettor liability for a crime that is the natural and probable consequence of the target offense. "At common law, a person encouraging or facilitating the commission of a crime could be held criminally liable not only for that crime, but for any other offense that was a 'natural and probable consequence' of the crime aided and abetted. [Citation.]" (*People v. Prettyman, supra,* 14 Cal.4th at p. 260.) The Supreme Court reiterated the principles set out in *People v. Croy* (1985) 41 Cal.3d 1 [221 Cal.Rptr. 592, 710 P.2d 392]: " '[An aider and abettor] is guilty not only of the offense he intended to facilitate or encourage, but also of any reasonably foreseeable offense committed by the person he aids and abets. . . . [¶] It follows that a defendant whose liability is predicated on his status as an aider and abettor need not have intended to encourage or facilitate the particular offense ultimately committed by the perpetrator. His knowledge that an act which is criminal was intended, and his action taken with the intent that the act be encouraged or facilitated, are sufficient to impose liability on him for any reasonably foreseeable offense committed as a consequence by the perpetrator. It is the intent to encourage and bring about conduct that is criminal, not the specific intent that is an element of the target offense, which . . . must be found by the jury.' (*Id.* at p. 12, fn. 5.) Thus, under *Croy,* a defendant may be held criminally responsible as an accomplice not only for the crime he or she intended to aid and abet (the target crime), but also for any other crime that is the 'natural and probable consequence' of the target crime." (*People v. Prettyman, supra,* 14 Cal.4th at p. 261.)

The *Prettyman* court set out the elements of aider and abettor liability on the natural and probable consequences theory: "the trier of fact must find that the defendant, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of a predicate or target offense; (3) by act or advice aided, promoted, encouraged or instigated the commission of the target crime. But the trier of fact must also find that (4) the defendant's confederate committed an offense *other than* the target crime; and (5) the offense committed by the confederate was a natural and probable consequence of the target crime that the defendant aided and abetted." (*People v. Prettyman, supra,* 14 Cal.4th at p. 262, fn. omitted.)

The court then turned to whether the trial court had a sua sponte duty to instruct on the elements of the target offense under the natural and probable consequences doctrine. It is a portion of this discussion on which Steven relies for his argument that his conviction cannot stand because there is no evidence that he knew Jimenez was armed or intended to use the gun in the fight.

The Supreme Court concluded that instructions on the elements of the uncharged target offense must be given "whenever uncharged target offenses form a part of the prosecutor's theory of criminal liability and substantial evidence supports the theory. When these conditions are satisfied, an instruction identifying and describing potential target offenses is necessary to minimize the risk that the jury, generally unversed in the intricacies of the criminal law, will 'indulge in unguided speculation' (*People* v. *Failla* [(1966) 64 Cal.2d 560,] 564[51 Cal.Rptr. 103, 414 P.2d 39]) when it applies the law to the evidence adduced at trial." (*People v. Prettyman, supra,* 14 Cal.4th at pp. 266-267.)

The key passage cited by Steven occurs in the Supreme Court's discussion of how an instruction on the target offense will "facilitate the jury's task of determining whether the charged crime allegedly committed by the aider and abettor's confederate was indeed a natural and probable consequence of any uncharged target crime that, the prosecution contends, the defendant knowingly aided and abetted." (*People v. Prettyman, supra,* 14 Cal.4th at p. 267.) The court gave examples based on the facts of the case before it. "If, for example, the jury had concluded that defendant Bray had encouraged codefendant Prettyman to commit an assault on [the victim] but that Bray had no reason to believe that Prettyman would use a deadly weapon such as a steel pipe to commit the assault, then the jury could not properly find that the murder . . . was a natural and probable consequence of the assault encouraged by Bray. (*People* v. *Butts* [(1965)] 236 Cal.App.2d [817,] 836 [46 Cal.Rptr. 362].) If, on the other hand, the jury had concluded that Bray encouraged Prettyman to assault [the victim] with the steel pipe, or by means of force likely to produce great bodily injury, then it could appropriately find that Prettyman's murder of [the victim] was a natural and probable consequence of that assault. Therefore, instructions identifying and describing the crime of assault with a deadly weapon or by means of force likely to produce great bodily injury (§ 245) as the appropriate target crime would have assisted the jury in determining whether Bray was guilty of . . . murder under the 'natural and probable consequences' doctrine." (*People v. Prettyman, supra,* 14 Cal.4th at p. 267.)

■    The Supreme Court has since elaborated on the test for determining whether the crime committed was the natural and probable consequence of the intended target crime. "A person who knowingly aids and abets criminal conduct is guilty of not only the intended crime but also of any other crime the perpetrator actually commits that is a natural and probable consequence of the intended crime. *The latter question is not whether the aider and abettor actually foresaw the additional crime, but whether, judged objectively, it was reasonably foreseeable. (People v. Prettyman, supra,* 14 Cal.4th at pp. 260-262.)" (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1133 [77 Cal.Rptr.2d

428, 959 P.2d 735] [evidence that aider and abettor was intoxicated is admissible in determining whether defendant had requisite knowledge of perpetrator's criminal purpose and intent to further that purpose], italics added.)

Under the *Mendoza* explication, the prosecutor was not required to present evidence that either Steven or Michael knew Jimenez intended to use a gun. Rather, the issue was whether it was reasonably foreseeable under the circumstances that the gun would be used to commit a criminal act other than the target offense of assault. Barrientos testified that the three defendants got out of the car and ran toward him and Llamas. He saw that Jimenez had a gun in his hand as he ran forward. Barrientos saw the gun before the scuffle between the two groups began. Llamas tried to take the gun away but could not, so Barrientos tried to help. Steven and Michael attacked Llamas after Llamas tried to take the gun away from Jimenez. After Jimenez shot Llamas, Barrientos attacked him and took the gun away. Before the shot was fired, Barrientos heard Michael say, "Shoot him, shoot him."

This is sufficient evidence from which the jury could conclude that it was reasonably foreseeable when the three defendants left the car that a fatal shooting would be the natural and probable consequence of the fight between the groups of young men. Consequently, the verdicts of first degree murder against both Steven and Michael are supported on the aiding and abetting theory.

Steven relies upon *People v. Hickles* (1997) 56 Cal.App.4th 1183 [66 Cal.Rptr.2d 86], which in turn cited the passage we have quoted from *Prettyman*. *Hickles* is distinguishable. In our case, the jury was properly instructed with CALJIC No. 3.02, the pattern instruction on liability of an aider and abettor for the natural and probable consequences of the target offense.[1] The jury also was given the standard instruction on the elements of assault (CALJIC No. 9.00). In *Hickles*, no instructions on the target offense were given. But more importantly, in *Hickles*, there was contradictory

---

[1] As given, CALJIC No. 3.02 read: "One who aids and abets another in the commission of a crime is not only guilty of that crime, but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crime originally aided and abetted. [¶] In order to find the defendant STEVEN GONZALES or MICHAEL GONZALES guilty of the crime of MURDER, as charged in Count 1, you must be satisfied beyond a reasonable doubt that: [¶] 1. The crime of ASSAULT was committed; [¶] 2. That the defendant STEVEN GONZALES or MICHAEL GONZALES aided and abetted that crime; [¶] 3. That a co-principal (MANUEL JIMENEZ) in that crime committed the crime of MURDER; AND [¶] 4. The crime of MURDER was a natural and probable consequence of the commission of the crime of ASSAULT. [¶] You are not required to unanimously agree as to which originally contemplated crime the defendant aided and abetted, so long as you are satisfied beyond a reasonable doubt and unanimously agree that the defendant aided and abetted the commission of an identified

evidence about the role that Hickles played in the fatal attack. The Court of Appeal concluded that unlike *People v. Prettyman, supra,* 14 Cal.4th 248, where the only potential target crime shown by the evidence was assault with a deadly weapon, there were several potential target crimes in the case before it. There was evidence which would have supported aiding and abetting a murder, an assault with a deadly weapon, a simple assault, or even just an argument. (*People v. Hickles, supra,* 56 Cal.App.4th at p. 1197.) Under these circumstances, without instructions on the elements of the target offense, the jury could not conclude that the murder was the natural and probable consequence of the target offense.

Our situation is not nearly so complex. The undisputed evidence is that the three defendants stopped and exited their car to engage in a fight with the victim and Barrientos. There was substantial evidence that Jimenez was visibly armed with a gun as he ran to the scene, that the men grappled for the gun, and that Michael yelled "shoot him." The standard instructions given were sufficient to facilitate the jury's determination that under these circumstances, Llamas's murder was a natural and probable consequence of the assault. The evidence from the independent witnesses that Jimenez did not draw out the gun until the fight was in progress was inconsistent with Barrientos's testimony, but that was for the jury to resolve. Even without the testimony of the police expert on gangs, the evidence was sufficient to support the verdicts.

█ The language we quoted from *People v. Mendoza, supra,* 18 Cal.4th 1114, 1133, disposes of Steven's related argument that the trial court had a sua sponte duty to instruct that an aider and abettor must have known that the shooter was armed or would use a firearm to be subject to liability based on the natural and probable consequences doctrine. That is not the law, and no such instruction was required.

## II*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## III

Steven challenges the trial court's imposition of a consecutive 25-years-to-life term under section 12022.53, subdivision (d) because the murder was committed with a firearm. Subdivision (e) of section 12022.53 authorizes

---

and defined target crime (Assault) and that the crime of Murder was a natural and probable consequence of the commission of that target crime."

*See footnote, *ante,* page 1.

imposition of the enhanced sentence on an aider and abettor if a criminal street gang allegation is pled and proved, as it was here.[2] Steven argues the statute violates his right to equal protection because it treats aiders and abettors of gang crimes differently from other aiders and abettors; that it violates his right to due process because the jury is not required to find that he knew or intended that the actual perpetrator was going to use a firearm; and that it violates the federal and state prohibitions against cruel or unusual punishment.

A.  *Equal Protection*

█  "In order to establish a meritorious claim under the equal protection provisions of our state and federal Constitutions appellant must first show that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner. [Citation.] Equal protection applies to ensure that persons similarly situated with respect to the legitimate purpose of the law receive like treatment; equal protection does not require identical treatment. (*People* v. *Romo* (1975) 14 Cal.3d 189, 196 [121 Cal.Rptr. 111, 534 P.2d 1015].)" (*People v. Green* (2000) 79 Cal.App.4th 921, 924 [94 Cal.Rptr.2d 355].)

" 'The use of the term "similarly situated" in this context refers only to the fact that " '[t]he Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same' . . . ." [Citation.] "There is always some difference between the two groups which a law treats in an unequal manner since an equal protection claim necessarily asserts that the law in some way distinguishes between the two groups. Thus, an equal protection claim cannot be resolved by simply observing that the members of group A have distinguishing characteristic X while the members of group B lack this characteristic. The 'similarly situated' prerequisite simply means that an equal protection claim cannot succeed, and does not require further analysis, unless there is some showing that the two groups are sufficiently similar with respect to the purpose of the law in question that some level of scrutiny is required in order to determine whether the distinction is justified." [Citation.]' . . . [¶] If it is determined that the law treats similarly situated groups differently, a second level of analysis is required. If the law in question impinges on the exercise of a fundamental right, it is subject to strict scrutiny and will be upheld only if it is necessary to further

---

[2]Section 12022.53, subdivision (e) provides: "(1) The enhancements specified in this section shall apply to any person charged as a principal in the commission of an offense that includes an allegation pursuant to this section when a violation of both this section and subdivision (b) of Section 186.22 are pled and proved." Subdivision (d) provides for a term of 25 years to life imprisonment for personal use of a firearm in a listed offense. Murder, the principal crime charged in this case, is a listed offense under subdivision (a)(1) of the statute.

a compelling state interest. All other legislation satisfies the requirements of equal protection if it bears a rational relationship to a legitimate state purpose. [Citation.] [¶] In *People* v. *Olivas* (1976) 17 Cal.3d 236, 251 [131 Cal.Rptr. 55, 551 P.2d 375], our Supreme Court declared that liberty is a fundamental interest and that classifications dealing with it must satisfy the strict scrutiny test. When exactly the strict scrutiny test must be applied to legislation defining crimes or gradations of criminal activity is a matter of dispute. (See *People* v. *Nguyen* (1997) 54 Cal.App.4th 705, 717, fn. 6 [63 Cal.Rptr.2d 173]; *People* v. *Bell* [(1996)] 45 Cal.App.4th [1030,] 1046-1049 [53 Cal.Rptr.2d 156].)" (*People v. Goslar* (1999) 70 Cal.App.4th 270, 276-277 [82 Cal.Rptr.2d 558].)

■ Defendants' arguments fail to establish that they are similarly situated to other aider and abettors. Steven argues that an aider and abettor of a gang member is similarly situated to aiders and abettors of firearm users who are not members of a criminal street gang. We do not agree.

Unlike other aiders and abettors who have encouraged the commission of a target offense resulting in a murder, defendants committed their crime with the purpose of promoting and furthering their street gang in its criminal conduct. The 25-year-to-life enhancement may not be imposed on an aider and abettor under section 12022.53 unless the jury finds the crime comes within section 186.22, subdivision (b). At the time of sentencing, that statute provided: "(1) [A]ny person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished by an additional term of one, two, or three years at the court's discretion." The parties stipulated that the Little Hill street gang is a criminal street gang within the meaning of section 186.22 and the jury found the criminal street gang allegation true.

Defendants were not similarly situated with other aiders and abettors, and on that basis, their equal protection argument fails.

B. *Due Process*

■ Steven contends that imposition of the section 12022.53 enhancement violates federal due process because "it permits a non-gun-using defendant in a gang case who is convicted of first degree murder as the natural and probable consequence of a <u>simple assault</u>, to be sentenced more severely than a person guilty as an accomplice to first degree murder, and it

permits this result <u>without any requirement that the jury find that the defendant knew or intended that the homicide be committed by the use or discharge of a firearm.</u>" (Underscoring in original.) Steven cites *People v. Beeman* (1984) 35 Cal.3d 547, 554-555 [199 Cal.Rptr. 60, 674 P.2d 1318] for the basic proposition that due process requires an aider and abettor to know of the unlawful purpose of the perpetrator and his unlawful intent when he promotes the commission of an offense.

Steven relies on *People v. Laster* (1997) 52 Cal.App.4th 1450 [61 Cal.Rptr.2d 680], an aiding and abetting case in which the actual offense was premeditated attempted murder (shooting at a basketball court full of people). In *Laster*, the court held that an aider and abettor may be subject to the enhanced penalty for premeditated attempted murder under section 664, subdivision (a) even if the aider did not personally deliberate or premeditate the crime of murder. (52 Cal.App.4th at pp. 1470-1473.) Steven's position is that this case requires an aider and abettor to know that the perpetrator intended to commit premeditated and deliberate murder. This mischaracterizes the holding. The *Laster* court concluded that "an aider and abettor can be subject to life imprisonment for willful, deliberate, and premeditated murder even if he or she did not personally deliberate or premeditate." (*Id.* at p. 1473.) Our case is distinguishable from *Laster* because here the ultimate offense was murder rather than attempted murder. We find nothing in *Laster* that requires an aider and abettor of a murder to know of the perpetrator's intent to commit murder, in order to be found guilty of murder under the natural and probable consequences doctrine.

We note that a later case, *People v. Lee* (2000) 85 Cal.App.4th 706 [102 Cal.Rptr.2d 403], review granted March 28, 2001 (S094597) disagreed with *Laster*'s holding on aider and abettor liability for attempted premeditated murder: "Contrary to *Laster*'s conclusion that the terms used in section 664 necessarily encompass an aider and abettor, the Legislature's intent in imposing derivative liability must be much clearer than the language used in section 664, subdivision (a)." (*Id.* at p. 733.) The court concluded: "[A]bsent evidence and a finding that the person aiding and abetting the attempted murder personally did so willfully, with deliberation and premeditation, we hold the greater penalty provision [of section 664, subdivision (a)] may not be applied vicariously. This does not lead to absurd results as expressed in *Laster*. The Legislature could rationally conclude that an actual perpetrator attempting to commit a willful, deliberate and premeditated murder is deserving of a greater sentence than a person who knowingly aided the perpetrator in a dangerous criminal enterprise without knowledge of or concurrence in the perpetrator's plan of willful deliberate murder." (*Lee*, at p. 737.)

We need not resolve the conflict between *People v. Laster, supra,* 52 Cal.App.4th 1450 and *People v. Lee, supra,* 85 Cal.App.4th 706, review

15

granted March 28, 2001 (S094597). Here, the issue is the enhancement imposed under section 12022.53, subdivision (e). As we have discussed, unlike section 664, subdivision (a), this statute is expressly drafted to extend the enhancement for gun use in any enumerated serious felony to gang members who aid and abet that offense in furtherance of the objectives of a criminal street gang. Section 12022.53, subdivision (e) is precisely the clear expression of legislative intent to extend an enhanced penalty to aiders and abettors the *Lee* court found to be missing in section 664, subdivision (a).

Steven's argument is contrary to aider and abettor jurisprudence in California. As we have seen, the only requirement is that the aider and abettor intend to facilitate the target offense and that the offense ultimately committed is the natural and probable consequence of the target offense.

## C. *Disparate Treatment*

Steven also argues that section 12022.53 violates state and federal guarantees of equal protection and due process because there is no rational or compelling basis for the disparate treatment of equally situated persons. He contends that section 12022.53 "treats similarly situated persons differently based on no compelling interest or rational basis other than the prosecution's unbridled discretion." He bases this argument on other gun enhancement provisions (§§ 12021.5, 12022, 12022.5), which provide sentence enhancements of one to 10 years for the personal use of a firearm. He argues that it is the prosecutor's discretion in deciding which of these enhancements to plead and prove, rather than the conduct of the defendant or the circumstances of the crime that determines the punishment to which the defendant is exposed. Steven cites no California authority to support his argument that this approach is constitutionally infirm. He cites *Chicago v. Morales* (1999) 527 U.S. 41 [119 S.Ct. 1849, 144 L.Ed.2d 67, 72 A.L.R.5th 665], a gang injunction case, for the proposition that a legislature must establish minimal guidelines to govern law enforcement. The constitutional infirmity in *Morales* was that the city's antigang loitering ordinance " 'provides absolute discretion to police officers to decide what activities constitute loitering.' [Citation.]" (*Id.* at pp. 61, 62-64 [119 S.Ct. at pp. 1861, 1861-1863].) Section 12022.53 does not suffer from this infirmity.

As pointed out in *People v. Bizieff* (1990) 226 Cal.App.3d 130, 138 [276 Cal.Rptr. 235]: "Prosecutors have great discretion in filing criminal charges. [Citation.] This discretion includes the choice of maximizing the available sentence (including charging of enhancements) to which a defendant might be exposed in the event of conviction [citations] and the timing of filing unrelated charges [citations]. Such discretion does not violate equal protection."

## D. *Cruel or Unusual Punishment*

■ Steven argues his 50-year-to-life sentence (25 years to life of which is imposed under § 12022.53) violates the California prohibition of cruel or unusual punishment. We rejected a similar challenge in *People v. Martinez* (1999) 76 Cal.App.4th 489 [90 Cal.Rptr.2d 517]. "The judicial inquiry commences with great deference to the Legislature. Fixing the penalty for crimes is the province of the Legislature, which is in the best position to evaluate the gravity of different crimes and to make judgments among different penological approaches. [Citations.] Only in the rarest of cases could a court declare that the length of a sentence mandated by the Legislature is unconstitutionally excessive. [Citations.]" (*Id.* at p. 494.) We concluded that the statute sets forth gradations of punishment based on increasingly serious types and consequences of firearm use in the commission of designated felonies. (*Id.* at p. 495.)

All three defendants invoke the California test for cruel or unusual punishment set out in *People v. Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697] and *In re Lynch* (1972) 8 Cal.3d 410 [105 Cal.Rptr. 217, 503 P.2d 921]. "The main technique of analysis under California law is to consider the nature of both the offense and of the offender. (*People v. Dillon*[, *supra,*] 34 Cal.3d 441, 479. . . .) The nature of the offense is viewed both in the abstract and in the totality of circumstances surrounding its actual commission; the nature of the offender focuses on the particular person before the court, the inquiry being whether the punishment is grossly disproportionate to the defendant's individual culpability, as shown by such factors as age, prior criminality, personal characteristics, and state of mind. [Citations.]" (*People v. Martinez, supra,* 76 Cal.App.4th at p. 494.)

Steven and Michael base their arguments on the fact that they were aiders and abettors, rather than the shooter. They acknowledge, as they must, that first degree murder is an extremely serious crime, but they ask us to focus on the nature of the enhancement for vicarious use of the firearm. They characterize the acts they committed as engaging in a fistfight of which murder was the natural and probable consequence. Again ignoring the evidence that Jimenez openly carried a gun on the way to the fight, and that Michael called for him to shoot the victim during the fight, Steven and Michael emphasize that the jury did not find they knew Jimenez had a gun and intended to use it. Based on this mischaracterization of the evidence, they argue it is cruel and unusual to impose the additional 25-year-to-life enhancement.

The evidence presents a more serious picture of the crime and the facts surrounding its commission. The defendants were gang members. Jimenez

■

had borrowed a gun. He and Steven went to Michael's house the day before the shooting and Jimenez told Steven he had a gun. Jimenez took the gun with him on the day of the shooting to a barbecue in Azusa Canyon. After the barbecue, the defendants encountered the victims as they drove back to Michael's house. They got out of their car and went to attack the victim and his companion because of their belief that the two had flashed the signs of a rival gang, thus disrespecting Michael's pregnant girlfriend, who was in the car with them. Jimenez carried the gun openly as they advanced on Llamas, and he pointed it at him. Llamas lunged for the weapon and the fight ensued. At one point, Michael called for Jimenez to shoot Llamas. There was evidence that Jimenez shot Llamas while one or more of the other defendants was holding Llamas down. The bullet entered the top of Llamas's head and exited through his mouth. The path of the bullet was consistent with Llamas being on the ground in a prone position when the gun was fired. These circumstances are far more serious than defendants indicate. None of them is extenuating.

The second factor is the nature of the offender and defendant's individual culpability. Steven had suffered a single prior juvenile case adjudication for possession of marijuana/hashish for sale. He argues that this relatively minor record weighs in favor of a finding of cruel or unusual punishment. It does, but the circumstances of Steven's participation in the fatal fight establish his individual culpability. Michael provides no argument about his own history and culpability. We find no constitutional violation in the imposition of the 50-year-to-life sentences on Steven and Michael.

Jimenez's argument is focused on the nature of the offender. He acknowledges the very serious nature of the offense, his culpability, the danger of the offense, and the danger of the offender to society. He argues that he was 14 years old when he shot Llamas and his only criminal history was an arrest for vandalism (§ 594, subd. (b)) and for being a runaway.

While Jimenez's youth and incidental criminal history are factors in his favor, they are substantially outweighed by the seriousness of the crime and the circumstances surrounding its commission, which we have discussed. The lack of a significant prior criminal record is not determinative in a cruel and unusual punishment analysis. (*People v. Martinez, supra,* 76 Cal.App.4th at p. 497.) Jimenez poses a great danger to society. Under the circumstances of this case, the sentence is not grossly disproportionate to the crime and does not constitute cruel and unusual punishment.

Steven also employs a comparative analysis, comparing his sentence to those imposed in California for vicarious arming, which is not in a gang

context and in other states, which do not impose vicarious liability for gun use based on a criminal street gang finding. He acknowledges that comparative or intercase proportionality review is not required under the federal Constitution except in rare cases where the sentence is grossly disproportionate to the offense, citing *Harmelin v. Michigan* (1991) 501 U.S. 957, 1001 [111 S.Ct. 2680, 2705, 115 L.Ed.2d 836], and that it is not required under California law.

Steven argues that his sentence is much more severe than that which would be imposed under California law on an actual killer who committed premeditated murder without a firearm. We rejected a similar argument in *People v. Martinez, supra,* 76 Cal.App.4th at pages 497-498: "[T]he Legislature determined in enacting section 12022.53 that the use of firearms in the commission of the designated felonies is such a danger that, 'substantially longer prison sentences must be imposed . . . in order to protect our citizens and to deter violent crime.' The ease with which a victim of one of the enumerated felonies could be killed or injured if a firearm is involved clearly supports a legislative distinction treating firearm offenses more harshly than the same crimes committed by other means, in order to deter the use of firearms and save lives. [Citations.]"

■ Steven also argues that the punishment imposed under section 12022.53 is unconstitutional because it is greater than the sentencing schemes in other states. We agree with the reasoning of the court in *People v. Martinez* (1999) 71 Cal.App.4th 1502, 1516 [84 Cal.Rptr.2d 638], a "Three Strikes" case: "That California's punishment scheme is among the most extreme does not compel the conclusion that it is unconstitutionally cruel or unusual. This state constitutional consideration does not require California to march in lockstep with other states in fashioning a penal code. It does not require 'conforming our Penal Code to the "majority rule" or the least common denominator of penalties nationwide.' [Citation.] Otherwise, California could never take the toughest stance against repeat offenders or any other type of criminal conduct. [¶] '[T]he needs and concerns of a particular state may induce it to treat certain crimes or particular repeat offenders more severely than any other state. . . . [¶] Whether a particular punishment is disproportionate to the offense is a question of degree. The choice of fitting and proper penalty is not an exact science but a legislative skill involving an appraisal of the evils to be corrected, the weighing of practical alternatives, consideration of relevant policy factors, and responsiveness to the public will. In some cases, leeway for experimentation may be permissible. Thus, the judiciary should not interfere in the process unless a statute prescribes a penalty " 'out of all proportion to the offense.' " ' (*People* v. *Cooper* [(1996)] 43 Cal.App.4th [815,] 827 [51 Cal.Rptr.2d 106], quoting *In re Lynch, supra,* 8 Cal.3d at pp. 423-424.)".

The Legislature has chosen to severely punish aiders and abettors to crimes by a principal armed with a gun committed in furtherance of the purposes of a criminal street gang. It has done so in recognition of the serious threats posed to the citizens of California by gang members using firearms. The penalty imposed on Steven was not out of proportion to this offense and does not constitute cruel or unusual punishment.

## IV, V*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

Each defendant's sentence is reversed because of the sentencing errors we have discussed. As to Michael Gonzales, on remand, the trial court shall specify the amount of restitution to be paid. In all other respects the judgments of conviction are affirmed.

Hastings, J., and Curry, J., concurred.

A petition for a rehearing was denied March 14, 2001, and the opinion was modified to read as printed above. Appellants' petitions for review by the Supreme Court were denied June 20, 2001.

*See footnote, *ante*, page 1.