Filed 6/25/13  P. v. Sanchez CA2/2
Opinion following remand from Supreme Court

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B230260 |
| Plaintiff and Respondent, | |
| v. | (Los Angeles County Super. Ct. No. BA342179) |
| MARCOS SANCHEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Lance A. Ito, Judge.  Affirmed with directions.

Allen G. Weinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven E. Mercer and Kathy S. Pomerantz, Deputy Attorneys General, for Plaintiff and Respondent.

_____

This case is before us on remand from the California Supreme Court. Pursuant to the Supreme Court's instructions, we have vacated our previous opinion in this case and reconsidered the cause in light of *Miller v. Alabama* (2012) 567 U.S. __ [132 S.Ct. 2455, 183 L.Ed.2d 407] (*Miller*). We conclude that the outcome remains the same.

## INTRODUCTION

Appellant Marcos Sanchez appeals from the judgment following a trial by jury in which he was convicted of first degree murder in violation of Penal Code section 187, subdivision (a)[1] (count 1), and conspiracy to commit murder in violation of section 182, subdivision (a) (count 2). The jury found true the firearm allegations that a principal personally used a firearm (§ 12022.53, subds. (b), (e)), personally and intentionally discharged a firearm (§ 12022.53, subds. (c), (e)), and did so causing death (§ 12022.53, subds. (d), (e)). The jury also found true the criminal street gang allegation (§ 186.22, subd. (b)(1)). The trial court sentenced appellant to a mandatory term of 50 years to life in state prison, calculated as 25 years to life on count 1, plus a consecutive term of 25 years to life for the firearm allegation that a principal personally and intentionally discharged a firearm causing death. The court imposed the same sentence on count 2, which was stayed pursuant to section 654. The court also imposed a 10-year sentence on the gang finding, but stayed the sentence in order to impose the increased sentence on the firearm enhancement. The court awarded appellant 998 days of actual custody credit and ordered him to pay $6,382.17 to the California Victim Compensation and Government Claims Board jointly and severally with his codefendant.

Appellant contends (1) there was insufficient evidence to support his conviction for conspiracy to commit murder, (2) his sentence was cruel and unusual in light of his young age of 16 years and eight days, and (3) modifications must be made to the abstract of judgment. We previously agreed that modifications must be made to the abstract of

_____

[1]    All further statutory references are to the Penal Code unless otherwise indicated.

judgment, but otherwise affirmed the judgment. On reconsideration of appellant's case in light of *Miller*, we affirm the judgment. The opinion we now file presents a revised analysis of the second issue (cruel and unusual punishment), but is generally the same as our original opinion regarding the remaining issues and the factual summary.

**FACTS**

**Prosecution Evidence**

On the evening of March 13, 2008, Jorge G. (Jorge) and some friends were standing outside his apartment on 80th Street in Los Angeles when Jorge saw appellant, whom he recognized as a student at his high school. Jorge had once seen appellant fighting at school and heard him claim to be a member of the "Southgate Bay 13" gang. Appellant approached the group with a much shorter male, who was later identified as Pedro R. (Pedro). Both appellant and Pedro were wearing hooded sweatshirts and Jorge testified they had the hoods over their heads. Jorge heard Pedro say that he and appellant "were about to do something" and "about [to] kill somebody."[2] Appellant was wearing a "doctor glove" on his right hand, and had a gun in his waistband. Appellant held the gun "once in awhile." When a car passed by, appellant put his hand on the gun. Pedro's hands were concealed. Jorge and his friends eventually went inside the apartment and heard a "shot." They went back outside and saw a body lying on the ground near Towne Avenue.

When the police first interviewed Jorge six months later on November 6, 2008, he did not identify appellant or Pedro from photographic six-packs. Jorge did identify appellant at the preliminary hearing on November 13, 2008.

Angie R., who was standing outside with Jorge on the night of the murder, identified appellant at a field show up later that night. She also identified appellant from a photographic six-pack, and identified him in court. Angie R. confirmed that appellant was wearing a plastic "doctor's" glove. She admitted testifying at the preliminary hearing that she saw appellant and Pedro walking up and down the street, looking at the

---

[2]    On cross-examination, Jorge testified Pedro said he was "going to blast someone."

victim's house. While she could not recall having testified at the preliminary hearing that appellant said he was "waiting for the other guy to come out so he could shoot him," in her recorded police interview played for the jury she stated that appellant "started talking to me, you know, about that he was going to shoot him . . . ."

Crystal C., who was also standing outside on the night of the murder, identified appellant in court, and said she had "seen him around" and at school. Her cousin Danny and appellant were friends, and she and Pedro were friends. On the night of the murder, Crystal C. saw appellant and Pedro walking on 80th Street. She identified appellant and Pedro in photographic six-packs shown to her by the police. With respect to appellant's photograph, Crystal C. wrote, "I seen him on the day they kill that man. That he was taking a log [*sic*] time to come outside to shot [*sic*] him." While she testified at trial that what she had written was not true, she admitted telling the police that appellant said he was going to shoot the victim, "that guy from the corner," and it was taking a long time for him to come outside.

The victim, 18-year-old Ricardo R. (Ricardo), was a member of the Kansas Street gang. On the night of the murder, his sister Kelley R. (Kelley) was standing outside her house with a friend and Ricardo. She saw appellant and Pedro passing in front of her house "over and over." She identified appellant in court and testified that she had seen him the day before the murder. She recognized Pedro because he had fought with her brother two days earlier. At some point, appellant and Pedro stopped walking and stood next to a tree near the corner of the street. Ricardo was leaning against a brick wall when "out of nowhere," he got shot in the head. Kelley identified appellant in a field show up later that night and was "sure" it was him. While she could not identify appellant in a photographic six-pack shown to her some time after the murder, she did identify appellant at the preliminary hearing. She also identified Pedro from a photographic six-pack.

Ricardo's autopsy results showed that he suffered a "through and through" gunshot to his head. According to the medical examiner, a bullet shot from a short

4

distance has a better chance of exiting the victim's body. The medical examiner opined that a .357 Magnum could propel a bullet through someone's head if the range of fire was not far away.

The day after the murder the police searched Pedro's house and recovered a .357-caliber revolver in the bedroom, a yellow notebook with gang writing on it, and a latex glove in the waste basket. The gun had a six-round capacity, and had five live rounds and one expended round. Appellant lived next door to Pedro. His house was also searched and the police recovered a shoebox with gang writing on it and numerous papers with writing consistent with the Southgate Bay 13 gang.

Los Angeles Police Department Detective Eric Crosson, who responded to the crime scene, was at the field show up involving Angie R. and confirmed that she identified appellant. Detective Crosson visited the crime scene numerous times. Approximately four days after the murder, he found a latex glove on the sidewalk of the 7900 block of Towne Avenue. The glove he found was smaller than the one found in Pedro's bedroom.

Detective Crosson taped some of the interviews he conducted during his investigation of the shooting. In general, he did not inform witnesses they were being taped. When he interviewed Crystal C., she stated "multiple times" that appellant said what she had written, i.e., that it was taking the victim a long time to come outside to shoot him.

When appellant was arrested, he did not have any tattoos on his hand. He later had "Bay" tattooed on his hand.

Detective Derek O'Malley of the Southgate Police Department testified as a gang expert. He was familiar with the Southgate Bay 13 gang, which had approximately 14 members and was a rival of the Kansas Street gang. Detective O'Malley knew Pedro, whose moniker was "Demon." Pedro had admitted to the detective that he was a member of the Southgate Bay 13 gang. The notebook recovered from Pedro's house was filled with gang writing and gang monikers. According to Detective O'Malley, "Bay" stands

5

for "Bad Ass Youngsters," or "Barrio Ardmore Youngsters." Detective O'Malley opined that Pedro was an active member of the Southgate Bay 13 gang, and that appellant was also a member of the gang. Detective O'Malley testified that the "y" in the "Bay" tattoo on appellant's hand was written in a manner associated with the gang. According to Detective O'Malley, it was not uncommon for a gang member to let other people know that he was planning to commit a crime. Based on a hypothetical using the facts of the case, Detective O'Malley opined that Ricardo's murder was committed for the benefit of, at the direction of, and in association with a criminal street gang.

**Defense Case**

Mitchell Eisen, who has a PhD in psychology and is an expert on eyewitness memory, testified about the limitations of human memory and the factors that tend to lead to inaccurate witness identification and testimony.

Marie Rodriguez, a defense investigator, interviewed Crystal C. on April 29, 2009. Crystal C. told her that she could not identify appellant because he had been wearing a hooded sweatshirt, and that Jorge informed her of appellant's identity.

According to a DNA expert, the gun recovered by the police contained the DNA of at least four different people, and the presence of appellant's and Pedro's DNA was inconclusive. The latex glove found at Pedro's house contained DNA from at least three sources, including appellant and Pedro. And the latex glove found near the crime scene did not contain DNA from appellant or Pedro.

**Stipulations**

The parties entered into several stipulations, including that if Brenda German had been called as a witness she would have testified to the following: "Brenda was present on March 13, 2008, in the driveway where [Ricardo] was shot. Prior to the shooting, Brenda saw two males walking back and forth on 80th Street. One male was taller than the other. The taller one was wearing a hooded sweatshirt and kept the hood pulled up, preventing Brenda from seeing his face. [¶] The two males went to the corner of Towne Avenue and 80th Street and crouched down. It looked like the shorter male was trying to

6

aim.  Brenda and Ricardo went inside the house for about 30 minutes, and then went back outside for about 30 minutes, at which time he was shot.  [¶]  Ricardo was leaning against the wall when he was shot.  Brenda was on his left, and [Kelley] was in front of him.  Brenda heard a single gunshot, and Ricardo fell to the ground.  Brenda did not see who shot or where the shot came from."

**DISCUSSION**

## I.  Substantial Evidence Supports Appellant's Conviction for Conspiracy to Commit Murder.

Appellant contends that his conviction for conspiracy to commit murder must be reversed because there was insufficient evidence to prove that he had agreed with anyone to commit murder.  We disagree.

When determining whether the evidence is sufficient to sustain a conviction, "our role on appeal is a limited one."  (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)  We review the entire record in the light most favorable to the judgment to determine whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt.  (*Ibid.*)  We presume in support of the judgment the existence of every fact that a trier of fact could reasonably deduce from the evidence.  This standard applies whether direct or circumstantial evidence is involved.  (*People v. Thompson* (2010) 49 Cal.4th 79, 113.)  "[I]t is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends."  (*People v. Maury* (2003) 30 Cal.4th 342, 403.)  Even when there is a significant amount of countervailing evidence, the testimony of a single witness can be sufficient to uphold a conviction.  (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1052.)  So long as the circumstances reasonably justify the trier of fact's finding, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant reversal of the judgment.  (*People v. Albillar* (2010) 51 Cal.4th 47, 60; *People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)  Reversal is not warranted unless it appears

that "'upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

A conspiracy is an agreement by two or more persons to commit an offense with the specific intent to commit the elements of the offense, coupled with an overt act by one or more of the conspirators in furtherance of the conspiracy. (§§ 182, subd. (a)(1), 184; *People v. Jurado* (2006) 38 Cal.4th 72, 130; *People v. Russo* (2001) 25 Cal.4th 1124, 1131.) "To prove an agreement, it is not necessary to establish the parties met and expressly agreed" to commit the target offense. (*People v. Vu* (2006) 143 Cal.App.4th 1009, 1025.) Rather, "'a criminal conspiracy may be shown by direct or circumstantial evidence that the parties positively or tacitly came to a mutual understanding to accomplish the act and unlawful design.'" (*Ibid.*, quoting *People v. Brown* (1969) 272 Cal.App.2d 623, 628.) Thus, "'a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy. [Citations.]'" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1135; *People v. Herrera* (2000) 83 Cal.App.4th 46, 64.)

We reject appellant's argument that there was insufficient evidence to show that he agreed with Pedro to commit murder. The evidence established that on the night of the murder appellant and Pedro were seen together, walking back and forth in front of Ricardo's house several times. Pedro had been in a fight with Ricardo a few days prior to the murder. Appellant and Pedro were members of the same gang, and Ricardo was a member of a rival gang. Appellant and Pedro talked with the group of people standing outside on 80th Street before the murder, and either appellant or Pedro told them they were planning to shoot someone and that it was taking this person a long time to come outside. Appellant was wearing a latex glove on his right hand, and kept touching a gun that was in his waistband. At some point, appellant and Pedro walked to the corner of Towne Avenue and 80th Street and crouched down. It appeared that Pedro was trying to take aim. The police recovered a .357-caliber gun and a latex glove from Pedro's house. One expended cartridge was found in the gun. Ricardo was shot by a single bullet to the

8

head that may have been fired with a .357 Magnum. Moreover, in the gang expert's opinion, the crime was gang-related. Based on these circumstances, the jury could easily infer that appellant and Pedro had a mutual agreement and intent to kill Ricardo. Accordingly, appellant's conviction for conspiracy to commit murder was supported by substantial evidence.

## II. Appellant's Sentence is Not Cruel and Unusual.

Appellant, who was 16 years eight days at the time of the murder, argues that his sentence of 50 years to life constitutes cruel and unusual punishment in violation of the federal and state Constitutions. Specifically, he argues that "his sentence of 50 years to life coupled with the fact that, had he been just 8 days younger, his case could not have been directly filed in adult court, and he may well have been treated as a juvenile, shocks the conscience, is grossly disproportionate to his crime, and violated the Eighth Amendment to the United States Constitution and the prohibition against cruel or unusual punishment under article I, section 17 of the California Constitution." We disagree.

A sentence constitutes cruel and unusual punishment under the Eighth Amendment if it is grossly disproportionate to the severity of the crime. (*Ewing v. California* (2003) 538 U.S. 11, 20; *Rummel v. Estelle* (1980) 445 U.S. 263, 271.) Similarly, a sentence is cruel or unusual under California law if it is so disproportionate to the crime as to shock the conscience and offend fundamental notions of dignity. (*In re Lynch* (1972) 8 Cal.3d 410, 424; *People v. Norman* (2003) 109 Cal.App.4th 221, 230.) The *Lynch* Court suggested a three-part analysis in which the court examines the nature of the offense and the defendant, the punishment for more serious offenses within the jurisdiction, and the punishment for similar offenses in other jurisdictions. (*In re Lynch, supra,* 8 Cal.3d at pp. 425, 431, 436.) Disproportionality of any one of these three factors can be sufficient to demonstrate that a particular punishment is cruel and unusual. (*People v. Dillon* (1983) 34 Cal.3d 441, 487, fn. 38.) Here, appellant discusses only the first factor.

In arguing that his sentence is disproportionate to his culpability, appellant primarily relies on *People v. Mendez* (2010) 188 Cal.App.4th 47, in which this court held that a sentence of 84 years to life imposed on a defendant who was 16 when he committed several nonhomicide crimes was unconstitutional as constituting a de facto sentence of life without parole (LWOP), which provided no meaningful opportunity for release. In reaching our conclusion, we relied on the United States Supreme Court's decision in *Graham v. Florida* (2010) 560 U.S. 48 (*Graham*), in which the Supreme Court held that a sentence of LWOP for any juvenile offender who did not commit a homicide was categorically cruel and unusual under the Eighth Amendment. Following *Graham*, our Supreme Court held that "sentencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy constitutes cruel and unusual punishment in violation of the Eighth Amendment." (*People v. Caballero* (2012) 55 Cal.4th 262, 268 [reversing 110-year-to-life sentence imposed on 16-year-old convicted of three gang-related attempted murders].)

The United States Supreme Court recently held in *Miller, supra*, 132 S.Ct. 2455 that a mandatory LWOP sentence for those under the age of 18 at the time of their crimes is cruel and unusual under the Eighth Amendment. (132 S.Ct. at p. 2460.) There, two 14-year-old offenders were convicted of murder and sentenced to LWOP. In neither case did the sentencer have any discretion to impose a different punishment. (*Ibid*.) Relying on *Graham* and *Roper v. Simmons* (2005) 543 U.S. 551, the *Miller* court concluded that such a mandatory LWOP sentencing scheme for minors was unconstitutional because it failed to consider the "foundational principle" that children are different from adults (*Miller, supra*, at p. 2465); they have "diminished culpability and greater prospects for reform" (*id*. at p. 2464).

*Miller* is distinguishable because appellant did not receive an LWOP sentence. Rather, he was sentenced to a mandatory term of 50 years to life (25 years to life for homicide plus 25 years to life for the firearm enhancement). Appellant nevertheless

10

argues that given his youth, this mandatory sentence constitutes an unconstitutional de facto LWOP sentence. Citing various statistical sources, he asserts that his life expectancy is somewhere between 64 to 76 years of age, without accounting for the impact of incarceration. Taking into account the harsh realities of prison, he argues it is reasonable to assume that he will actually live less than 50 years from the time he was sentenced, thus precluding any meaningful prospect of ever facing parole or release.

But we cannot necessarily conclude that a mandatory sentence of 50 years to life imposed on a juvenile offender who was 16 when he committed homicide constitutes de facto LWOP. It is entirely possible that appellant will become eligible for parole or release during his lifetime.

We are satisfied that under the circumstances here, appellant's murder sentence is not unconstitutional. The evidence showed that prior to the murder, appellant and fellow gang member Pedro bragged to some people in the neighborhood that they were going to shoot someone, and appellant was holding a gun while wearing a latex glove on his hand. Appellant and Pedro laid in wait, walking back and forth in front of Ricardo's house until he came out. They crouched down and either appellant or Pedro shot Ricardo point blank in the head with one bullet while Ricardo was standing with his sister and a friend. Appellant's actions demonstrated a complete lack of mercy and disregard for human life, and a lack of concern whether others might also be shot.

Appellant attempts to minimize the seriousness of his conduct by pointing out there was no evidence or jury finding that he was the actual shooter. But had the jury made a finding that appellant personally discharged the firearm causing death, he would have received a mandatory 10-year increase in his sentence. (§§ 186.22, subd. (b)(1)(C), 12022.53, subd. (e)(2).)[3]

---

[3] In sentencing appellant, the trial court stated: "And the jury found that your participation—the fact that you brought the firearm to the event, that you told the people there at the crime scene, that—the house three or four houses down, that you were there waiting for some guy so you could blast him, sounds like you were lying in wait for the victim to appear, and then you took advantage of the fact that he was not expecting you,

11

Appellant also points to his limited criminal record, which consists of a single offense of vehicle theft committed when he was 15 years old for which he received home probation and jurisdiction was terminated 10 months later. Based on the facts here, we find that appellant's youth and minor criminal record were "substantially outweighed by the seriousness of the crime[s] and the circumstances surrounding [their] commission . . . ." (*People v. Gonzales* (2001) 87 Cal.App.4th 1, 17.)

As appellant acknowledges, successful challenges to sentences on the grounds of cruel and unusual punishment are rare. (*In re Nuñez* (2009) 173 Cal.App.4th 709, 735; *Rummel v. Estelle, supra,* 445 U.S. at p. 272.) Indeed, as the People note, appellant's sentence compares favorably with those in other cases rejecting cruel and unusual punishment claims involving serious crimes committed by young defendants with limited prior criminal records. (See, e.g., *People v. Em* (2009) 171 Cal.App.4th 964, 972–977 [upholding sentence of 50 years to life for 15-year-old gang member who committed murder during a robbery and whose prior record was not extensive]; *People v. Demirdjian* (2006) 144 Cal.App.4th 10, 14–16 [15-year-old's sentence of two consecutive terms of 25 years to life for two special circumstance murders did not violate state or federal Constitutions]; *People v. Villegas* (2001) 92 Cal.App.4th 1217, 1230–1231 [upholding sentence of 40 years to life for 17-year-old gang member who committed attempted murder with a firearm]; *People v. Gonzales, supra,* 87 Cal.App.4th at p. 17 [upholding sentence of 50 years to life for 14-year-old gang member who committed murder].) Appellant is a great danger to society. This is not one of the rare cases in which the sentence imposed should be reduced as cruel and unusual.

## III. Appellant Should be Awarded One Additional Day of Actual Custody Credit.

Appellant contends, and the People concede, that he is entitled to one additional day of actual custody credit.

---

you ambushed him, you and your friend. So the fact that you might not . . . have been the person who actually pulled the trigger does not absolve you from criminal responsibility in the state of California."

Pursuant to section 2900.5, subdivision (a), a defendant convicted of a felony is entitled to credit against a state prison term for actual time spent in custody before commencement of the prison sentence, including the day of sentencing. (§ 2900.5, subd. (a); *People v. Smith* (1989) 211 Cal.App.3d 523, 526.) Generally, an appellant may not appeal an error in the calculation of presentence custody credit unless the claim is first presented in the trial court, which did not occur here. (§ 1237.1.) However, the Court of Appeal may address a presentence custody credit issue if other claims are also raised on appeal. (*People v. Mendez* (1999) 19 Cal.4th 1084, 1100–1101; *People v. Acosta* (1996) 48 Cal.App.4th 411, 420–421.)

As a general rule, the time credited includes the date of arrest, the date of sentencing, and every day in between. (*People v. Smith, supra*, 211 Cal.App.3d at p. 526 ["Since section 2900.5 speaks in terms of 'days' instead of 'hours,' it is presumed the Legislature intended to treat any partial day as a whole day"].) The probation report states that appellant was arrested on March 17, 2008, and he was sentenced on December 10, 2010. This time span is 999 days. Because the trial court only awarded appellant 998 days of custody credit, the abstract of judgment must be amended to reflect 999 days of actual custody credit.

## IV. The Abstract of Judgment Must be Corrected Regarding the Payment of Restitution.

Appellant contends, and the People concede, that the abstract of judgment must be corrected because it does not reflect that he and Pedro are jointly and severally liable to pay $6,382.17 in restitution, and it improperly states that such restitution is to be paid to the "victim(s)," rather than to the State Victim Compensation Board.

At the sentencing hearing, the trial court ordered that appellant and Pedro are jointly and severally liable to pay restitution, and that such restitution should be paid to the "Victim Compensation Government Claims Board." Because the oral pronouncement of judgment by the sentencing judge is the judicial act which constitutes the rendition of judgment, it controls over any conflicting written court documents.

13

(*People v. Mesa* (1975) 14 Cal.3d 466, 471; *People v. Hartsell* (1973) 34 Cal.App.3d 8, 13; *People v. Hong* (1998) 64 Cal.App.4th 1071, 1075.)  If an abstract of judgment fails to reflect the judgment pronounced by the trial court, the error is clerical and the abstract can be corrected at any time to make it reflect the true facts.  (*People v. Mitchell* (2001) 26 Cal.4th 181, 185; *People v. Williams* (1992) 10 Cal.App.4th 827, 830, fn. 3; *People v. Jack* (1989) 213 Cal.App.3d 913, 915; *People v. Rowland* (1988) 206 Cal.App.3d 119, 123; *People v. Mesa, supra,* at p. 471; *In re Candelario* (1970) 3 Cal.3d 702, 705.) Accordingly, the abstract of judgment must be corrected here.

## DISPOSITION

The trial court is directed to amend the abstract of judgment to reflect 999 days of actual custody credit and to reflect that appellant is jointly and severally liable for $6,382.17 in restitution to be paid to the California Victim Compensation and Government Claims Board, and to forward the amended abstract to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
     ASHMANN-GERST


We concur:


_____, P. J.
   BOREN


_____, J.
   CHAVEZ


14