Filed 1/8/14  P. v. Alcarez CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B242197 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA072796) |
| v. | |
| ERNESTO ALCAREZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Stephen A. Marcus, Judge.  Remanded for resentencing; Affirmed as modified.

Richard L. Rubin, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Tannaz Kouhpainezhad, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

Defendant Ernesto Alcarez appeals from the judgment entered on his convictions for one count of murder for the shooting death of Cheryl Green and seven counts of attempted murder. Alcarez was convicted as an aider and abettor under the natural and probable consequences doctrine, based on his role as the lookout assisting his fellow gang member, Jonathan Fajardo, who shot multiple rounds at a group of African-American men, women and children who were socializing in front of a residence in the Hispanic gang's territory.

Alcarez contends that the trial court gave the jury a misleading instruction regarding the "kill zone" theory, which theory permits a jury to find a defendant guilty of attempted murder where it finds that the defendant intended to kill everyone in the vicinity of a primary target in order to ensure that the primary target was killed. He contends that the particular instruction given, CALJIC No. 8.66.1, permitted the jury to find him guilty of attempted murder on an aiding and abetting theory merely because Fajardo exposed the victims to a risk of harm, and as phrased the instruction did not require a finding that Fajardo intended to kill the victims. He further contends that the phrase "kill zone" used in the instruction is a provocative and unnecessary description that is impermissibly argumentative. We reject both contentions and find no error in the trial court's "kill zone" instruction.

Alcarez also challenges his sentence, arguing that the imposition of eight consecutive enhancement terms pursuant to section 12022.53, subdivision (d),[1] totaling more than 200 years to life, violates the prohibition against cruel and unusual punishment. He further contends that his trial counsel rendered ineffective assistance in failing to object to the sentence on this ground. We conclude that his

---

[1] All undesignated code references are to the Penal Code.

sentence does not constitute cruel and unusual punishment, and thus his trial counsel did not render ineffective assistance by failing to so object.

Alcarez further contends, and the Attorney General concedes, that the abstract of judgment erroneously states that Alcarez was convicted of attempted *willful, deliberate, and premeditated* murder in counts 2 through 8. Although the jury found Alcarez guilty of seven counts of attempted murder, it found not true the allegations that the offenses were willful, deliberate, and premeditated. Therefore, we order the abstract of judgment to be corrected to delete the notations suggesting that the attempted murders in counts 2 through 8 were willful, deliberate and premeditated. We further order the abstract of judgment to be corrected to state the $150 victim restitution fine owed to Charlene Lovette.

Finally, we conclude that the trial court imposed an illegal sentence when it imposed one-third the midterm for each of the attempted murder counts (counts 2 through 8) consecutive to the indeterminate term for the murder count (count 1). Instead, the court should have chosen a determinate term for one of the attempted murder counts from the triad of available sentences for that crime (5, 7, or 9 years (§ 664)) plus applicable enhancements, and then, consecutive to *that term*, imposed terms of one-third the midterm (plus enhancements) for the remaining attempted murder counts. The court then should have combined the sentences on those counts with the indeterminate term (plus the applicable enhancement) for the murder count (count 1) to reach a total aggregate sentence, with the determinate sentence on the attempted murder counts to be served first. We therefore remand for resentencing, but otherwise affirm.

3

# FACTUAL AND PROCEDURAL BACKGROUND

*Procedural History*

Alcarez was charged in count 1 with the murder of Cheryl Green. Counts 2 through 8 alleged attempted murder of Nicole Buckner, Isadream Sims, Donald Rucker, Andre West, Anthony Buckner, Necharda Jones, and Kenny Davis.[2]

After an eight-day jury trial, the jury returned a verdict finding Alcarez guilty as an aider and abettor of second degree murder as to count 1 and attempted murder as to counts 2 through 8. As to all counts the jury found true the alleged firearm enhancements (§§ 12022.53, subds. (b), (c), (d) and (e)), and a gang enhancement (§ 186.22, subd. (b)(1)(C)). The jury found that none of the attempted murders were willful, deliberate, and premeditated, but found that these offenses were hate crimes and that Alcarez committed them voluntarily and in concert with another and others (§ 422.75, subd. (b)).

The court sentenced Alcarez to a total of 238 years, four months to life in state prison. As to count 1, Alcarez was sentenced to 15 years to life, plus 25 years pursuant to section 12022.53, subdivision (d), to run consecutively, for a total of 40 years to life. As to counts 2 through 8, Alcarez was sentenced for each count to one-third the midterm of seven years for two years, four months, plus one year pursuant to section 422.75, subdivision (b), plus 25 years to life pursuant to section 12022.53, subdivision (d), to run consecutively, for a total of 28 years, four months to life as to each count. The remaining firearm and gang enhancements were stayed pursuant to section 654. The court ordered Alcarez to pay a $320 court security fee (§ 1465.8, subd. (a)(1)), a $240 criminal conviction assessment (Gov. Code, § 70373), a $7,029.71 restitution fine ($6,879.71 to the State Victim

---

[2]    Codefendant Fajardo was charged in the same information, but was tried separately.

Compensation Board and $150 to Charlene Lovette) (§ 1202.4, subd. (f)), and an $8,000 restitution fine (§ 1202.4, subd. (b)), and imposed and stayed an equal parole revocation fine (§ 1202.45). Alcarez was awarded 2,310 days of presentence custody credit.

*Pertinent Evidence at Trial*[3]

    A. *Victim Testimony*

    On the afternoon of December 15, 2006, a group of eight African-Americans -- Anthony Buckner, his sister Nicole Buckner, his female cousins Necharda Jones and Isadream Sims, his five-year old cousin, Kenny Davis, Nicole's boyfriend Donald Rucker, Necharda's boyfriend Andre West, and their 14-year old friend Cheryl Green -- were socializing outside Kenny's house, standing quite close together in the driveway between Kenny's house and the neighbor's house. For sake of clarity, we hereafter refer to the victims by their first names.

    Necharda testified that just prior to the shooting she saw a gray Toyota Corolla drive by. A young Hispanic male who was driving stopped the car briefly in front of the driveway of Kenny's house, and made a pointing gesture with his index finger to two men who were approaching, as if he was pointing out the group standing in the driveway. It appeared as if he was directing the two men who were approaching to do something.

    As the two men approached, Necharda saw that one of them (later identified as Fajardo) had a large revolver in his hand, and the second man appeared to be acting as the lookout. The shooter aimed his gun at the area where the members of the group were all standing quite close together. Necharda stated that the bullet could have hit any of them because the gun was aimed at all of them, but Cheryl

---

[3]    The defense presented no witnesses or evidence at trial.

was hit because she happened to be the closest to the shooter.  Necharda ducked behind the car in the driveway and grabbed her little brother, Kenny, and while they took cover there, Necharda heard five to seven more shots.

Anthony testified that at the time the two men approached the group, he was kneeling on the ground, showing Kenny how to play a game on his cell phone.  When the two men got to within several feet, Fajardo pointed a .44 caliber revolver at Anthony and Kenny, with the other man standing several feet behind him.  Anthony heard the gun click twice while Fajardo was pointing it at him and Kenny, but the gun did not fire.  Anthony threw Kenny under the car in the driveway.  Then he saw Fajardo move his arm to the right and point the gun at Cheryl, and Anthony heard shots while the gun was pointed in her direction.  Anthony took off running towards the back of the house to take cover, and as he, Nicole, and Donald reached the fence at the back of the driveway, he saw Fajardo point the gun towards them and heard three or four more gunshots.  While he helped Nicole over the fence, he saw that her pinkie was hanging off, and that Donald had two bullet wounds to his upper body.

After a few minutes he returned to the front of the house and found Cheryl lying on the ground, dying, with a bullet wound near her heart.  He drove her to the hospital where she was pronounced dead.  Anthony testified that Isadream also had a graze wound on the top of her head.

Nicole testified that she saw the shooter point the gun at Anthony and Kenny.  She heard it jam, and then she started running to the back of the fence.  Seconds later she heard gunfire.  She thought she heard five or six shots fired.

Donald testified that when the shooter approached, the group was all close together.  The shooter pointed his gun at Cheryl, and then once she was hit, he

6

pointed the gun to the rest of the group as they ran towards the back of the house, and Donald heard five or six gunshots.

B. *Pertinent Details of Police Investigation*

1. *Alcarez Confession*

Alcarez's videotaped confession was played for the jury and a transcript admitted into evidence. He acknowledged that he had been a member of the 204th Street Gang for almost four years. Alcarez stated that a week before the Cheryl Green shooting, "the Black people, they shot some Mexican." This made his gang "mad" and led them to tag their territory with anti-African-American graffiti such as "NK," which a gang expert at trial testified stood for "Nigger Killer."

After initially denying involvement in the Cheryl Green shooting, Alcarez admitted to being involved. He stated that he and some friends, including Fajardo, were outside a market on the corner of Harvard Boulevard and 205th Street, when an African-American man in a green Chevy Tahoe drove by and brandished a gun. Alcarez stated that Fajardo left to get a gun and came back, although later in the interview Alcarez stated that initially he was not sure that Fajardo had the gun, because everyone ran in a different direction and he did not know who had the gun or where they went to get it. Fajardo and Alcarez then walked to 206th Street, where they saw an African-American man; Alcarez realized Fajardo had the gun when they "were almost there." Fajardo told Alcarez to watch his back and Alcarez stood next to him and acted as the lookout, with a broken bottle in his hand. Fajardo fired two shots and then he and Alcarez ran away. Alcarez stated that he was not sure if Fajardo shot at the same man who had brandished the gun in the green Tahoe, and Alcarez did not see the Tahoe at the location of the shooting.

7

## 2. *Gang Evidence*

Los Angeles Police Sergeant Daniel Robbins testified as an expert on the 204th Street Gang. He identified Alcarez and Fajardo as known members. He indicated that the shooting of Cheryl Green took place in 204th Street Gang territory. The gang was known to be antagonistic towards African-American people in general, and the gang increasingly had targeted African-American men, women and children in their territory with racist graffiti and violence. This trend was precipitated by the change in demographics in the area, as more African-Americans moved into the mostly Hispanic neighborhood.

*Pertinent Jury Instructions*

As to the attempted murder counts, the jury was first instructed with CALJIC No. 8.66, which provides the elements of attempted murder, including "a specific intent to kill unlawfully another human being." The jury was also instructed with CALJIC No. 8.66.1, the "kill zone" theory, which provides as follows: "A person who primarily intends to kill one person, may also concurrently intend to kill other persons within a particular zone of risk. This zone of risk is termed the 'kill zone.' The intent is concurrent when the nature and scope of the attack, while directed at a primary victim, are such that it is reasonable to infer the perpetrator intended kill the primary victim by killing everyone in that victim's vicinity. [¶] Whether a perpetrator actually intended to kill the victim, either as a primary target or as someone within a ['kill zone'] [zone of risk] is an issue to be decided by you." Defense counsel did not object to the instruction being given.

The jury was also instructed with CALJIC No. 1.01, which instructed the jury not to single out any particular sentence, point or instruction and ignore the

8

others, and instead to "[c]onsider the instructions as a whole and each in light of all the others."

*Closing Arguments*

The prosecution argued that the evidence demonstrated that on the day of the Cheryl Green shooting, Fajardo and Alcarez wanted to kill any African-American person that they found in their gang's territory, not only because of the gang's overall antipathy to African-Americans but also because they were particularly incensed because of an incident the week earlier where an African-American had killed a Hispanic and because of the incident earlier that same day where an African-American man in a truck had brandished a gun at them. The prosecution argued that Fajardo and Alcarez's fellow gang member specifically instructed them to target the group of eight African-Americans, merely because they were African-American.

The prosecution further argued that Fajardo intended to kill each member of the group of eight people. It argued that after pointing the gun at Kenny and Anthony and having the gun jam when he pulled the trigger, and then successfully shooting Cheryl in the chest, Fajardo pointed the gun and shot at everyone else who was trapped close together in small space between two houses, trying to flee. The prosecutor noted that witnesses testified that Fajardo fired five or six shots from a close range at the fleeing victims.

The prosecution further argued as follows with respect to the "kill zone" theory: "[W]ith regard to attempted murder, the law really, really sort of describes the kind of case you're dealing with here. We're dealing with a situation in which the defendant and his companion emptied a gun on a crowded group of people. The instruction 8.66.1 indicates that, when the nature and scope of the attack, while

9

directed at a primary victim, are such that it's reasonable to infer the perpetrator intended to kill the primary victim by killing everyone in that victim's vicinity, then it is attempted murder as to all of them. [¶] So you don't necessarily have to count bullets and count the number of victims who are out there. You don't have to think about exactly how many feet apart these young people were. You know, it can't be many feet apart based upon the distance between the houses. But essentially, if the actions of the defendant and [Fajardo] were such that, in an attempt to kill members of that group, they sprayed the entire group to annihilate the whole group, it can be attempted murder as to all of them."

The defense argued that Alcarez had no knowledge that Fajardo intended to kill the members of the African-American group, and that the evidence showed only that Alcarez was standing near Fajardo during the shooting and did not take an active part.

## DISCUSSION

I. *"Kill Zone" Jury Instruction*

Alcarez contends that the trial court erred in instructing the jury with CALJIC No. 8.66.1, the "kill zone" instruction, because the language of the instruction is misleading in that it suggests that a defendant can be convicted of attempted murder merely by subjecting individuals other than his intended target to a risk of fatal injury, and thus "lends itself to an overly broad interpretation of the crime of attempted murder." Alcarez does not contend that the kill zone theory is inapplicable to the facts adduced at trial, but rather argues that CALJIC No. 8.66.1 misstates the kill zone theory.

The defense did not object below to the jury being instructed with CALJIC No. 8.66.1, and thus the Attorney General contends that the challenge to this

10

instruction was not preserved for appeal. "'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' [Citation.] But that rule does not apply when . . . the trial court gives an instruction that is an incorrect statement of the law." (*People v. Hudson* (2006) 38 Cal.4th 1002, 1011-1012.) To the extent Alcarez's argument rests upon the contention that CALJIC No. 8.66.1 incorrectly states the law, his failure to object does not result in a forfeiture of the issue on appeal, and thus we consider the merits of his contention. (*Ibid.*)

In evaluating a claim that the jury could have misconstrued an instruction, we consider whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the Constitution. (*People v. Raley* (1992) 2 Cal.4th 870, 901.) "[W]e view the challenged instruction in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner." (*People v. Houston* (2012) 54 Cal.4th 1186, 1229 (*Houston*); see *People v. Carrington* (2009) 47 Cal.4th 145, 192 ["'[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' [Citations.]"].) "A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant." (*People v. Cross* (2008) 45 Cal.4th 58, 67-68.) "We credit jurors with intelligence and common sense [citation] and do not assume that these virtues will abandon them when presented with a court's instructions." (*People v. Coddington* (2000) 23 Cal.4th 529, 594, overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046.)

11

A. *Attempted Murder Law*

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing. [Citation.]" (*People v. Ervine* (2009) 47 Cal.4th 745, 785; see *Houston, supra,* 54 Cal.4th at p. 1217.) In *People v. Bland* (2002) 28 Cal.4th 313 (*Bland*), the court concluded that the doctrine of transferred intent applies to unintended killings, but not to persons not killed. (*Id.* at p. 317.) "To be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else. The defendant's mental state must be examined as to each alleged attempted murder victim." (*Id.* at p. 328; see *People v. Perez* (2010) 50 Cal.4th 222, 230 (*Perez*).) However, "this is true whether the alleged victim was particularly targeted or randomly chosen." (*People v. Stone* (2009) 46 Cal.4th 131, 141 (*Stone*).) Even though attempted murder requires a specific intent to kill, the defendant need only harbor "'the intent to kill *a* human being, not a *particular* human being.'" (*Perez, supra*, 50 Cal.4th at p. 230.) Thus, in *Stone*, the California Supreme Court held that "a person who shoots into a group of people, intending to kill one of the group, but not knowing or caring which one, [can] be convicted of attempted murder." (*Stone, supra*, 46 Cal.4th at p. 134.) "An indiscriminate would-be killer is just as culpable as one who targets a specific person." (*Id.* at p. 140; *People v. Amperano* (2011) 199 Cal.App.4th 336, 341 ["'[A] person who intends to kill can be guilty of attempted murder even if the person has no specific target in mind.'"].) Under this reasoning, "a defendant can be convicted of several attempted murders if he intended to kill several people, even if there were no particular people he intended to kill." (*People v. McCloud* (2012) 211 Cal.App.4th 788, 798-799, review denied, Mar. 13, 2013 (*McCloud*).)

12

In addition, *Bland* clarified that a person who shoots at a group of people may be punished for the actions toward everyone in the group even if that person primarily targeted only one of them. (*Bland, supra,* 28 Cal.4th at p. 329.) The person might still be guilty of attempted murder of everyone in the group on a theory of "concurrent intent." (*Ibid.*) Under the concurrent intent doctrine, the requisite mental state for attempted murder can be inferred "'when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity.'" (*Ibid.*) Examples of this "kill zone" theory enunciated in *Bland* include placing a bomb on a plane when the desire is to kill a particular person on board or firing an automatic weapon at a group of people on the street motivated by the desire to kill one particular person in the group. (*Id.* at p. 330.)

## B. *CALJIC No. 8.66.1 "Kill Zone" Instruction As Misleading*

In this case, the trial court instructed the jury with CALJIC No. 8.66.1, which describes the "kill zone" theory as follows: "A person who primarily intends to kill one person, may also concurrently intend to kill other persons within a particular zone of risk. This zone of risk is termed the 'kill zone.' The intent is concurrent when the nature and scope of the attack, while directed at a primary victim, are such that it is reasonable to infer the perpetrator intended to kill the primary victim by killing everyone in that victim's vicinity. [¶] Whether a perpetrator actually intended to kill the victim, either as a primary target or as someone within a ['kill zone'] [zone of risk] is an issue to be decided by you."

Alcarez contends that CALJIC No. 8.66.1 misstates the kill zone theory of culpability by suggesting that a defendant who subjects individuals other than his

13

primary target to a risk of fatal injury may be found guilty of attempted murder, even if he did not intend to kill those individuals. Alcarez bases this argument on dicta in *McCloud*, a relatively recent decision by our Division 1 colleagues. (*McCloud, supra,* 211 Cal.App.4th 788.)

In *McCloud*, two defendants fired 10 shots from a nine-millimeter semiautomatic handgun into a packed party inside a lodge where over 400 people were present. Three bullets hit three victims, killing two and injuring another, and the last seven bullets hit no one. (*McCloud, supra,* 211 Cal.App.4th at pp. 791, 793-794.) The defendants were each convicted of two counts of second degree murder, and one of them (Stringer) was convicted of 46 counts of attempted murder. (*Id.* at p. 791.) The jury was instructed with CALJIC No. 8.66.1, and the prosecution argued in its closing statement that "'[t]he kill zone says that anyone who is in the line of fire, anyone who could have potentially been hit is a victim of that attempted murder. . . . You take a gun, you sho[o]t at a party, you are not sure who at that party is going to get hit, you can still get the kill zone. You are still endangering every single person in that line of fire.' . . . 'All of those kids are all in the zone of risk. All of them are potential and actual victims in this case.'" (*Id.* at p. 801.)

The appellate court found that the prosecution's argument was based on an erroneous conception of the kill zone theory, because (1) the prosecution did not argue there was a primary target, and (2) the prosecution's argument "assumed that individuals who are merely endangered or put 'at risk' or located within 'the zone of risk' are attempted murder victims on the kill zone theory. That is incorrect as a matter of law. The prosecutor never attempted to argue that Stringer . . . specifically intended to kill every single person in each of the putative kill zones, as the kill zone theory would actually require." (*McCloud, supra,* 211 Cal.App.4th

14

at p. 802.)  The court thus found that the record did not contain substantial evidence to support application of the kill zone theory to that case, and found that the attempted murder counts had to be reversed.  (*Id.* at pp. 802, 804.)

Having stated its holding, the court further "note[d] that the language of CALJIC No. 8.66.1, the pattern instruction that was given to the jury concerning the kill zone theory, directly lends itself to the prosecutor's incorrect statement of the theory, so the instruction should probably be revised. . . .  The instruction's repeated references to a 'zone of risk' are misleading and have no basis in the law—neither the phrase 'zone of risk' nor even the word 'risk' appears anywhere in *Bland*. . . .  By referring repeatedly to a 'zone of risk,' the instruction suggests to the jury that a defendant can create a kill zone merely by subjecting individuals other than the primary target to a risk of fatal injury.  As we have already explained, that is not correct." (*McCloud, supra*, 211 Cal.App.4th at p. 802, fn. 7.)

Unlike the prosecutor in *McCloud*, who did not argue that the defendant specifically intended to kill every person in the asserted "kill zone" and instead essentially suggested that recklessness as to who might be shot was sufficient for attempted murder (*McCloud, supra*, 211 Cal.App.4th at p. 802), the prosecution in the instant case argued that Alcarez and Fajardo specifically intended to kill each of the eight people in the group.  Further, the prosecution advised the jury that CALJIC No. 8.66.1 "indicates that, when the nature and scope of the attack, while directed at a primary victim, are such that it's reasonable to infer the perpetrator intended to kill the primary victim by killing everyone in that victim's vicinity, then it is attempted murder as to all of them.  [¶]  . . . [I]f the actions of the defendant and [Fajardo] were such that, in an attempt to kill members of that group, they sprayed the entire group to annihilate the whole group, it can be attempted murder as to all of them."  Therefore, the prosecutor plainly stated that

15

in order to find Alcarez guilty of all the attempted murder charges, the jury had to find that he (or at least Fajardo, whom he was aiding and abetting) intended to "annihilate the whole group." Thus, there was no issue in the instant case of the prosecution compounding the effects of any ambiguous or misleading language in CALJIC No. 8.66.1 through misleading closing arguments.

Further, we conclude that the use of the phrase "zone of risk" in CALJIC No. 8.66.1 cannot be viewed in isolation, but rather must be construed in light of the overall instruction of which the phrase is a part. (*People v. Ledesma* (2006) 39 Cal.4th 641, 718.) The instruction expressly stated, "A person who primarily intends to kill one person, may also concurrently intend to kill other persons within a particular zone of risk." It further indicated that the defendant must intend to kill the alleged victim, either as a primary target or as someone within a kill zone. Viewed as a whole, the instruction adequately imparted the requirement that the jury find that Fajardo harbored a specific intent to kill in order to find Alcarez guilty of attempted murder as an aider and abettor. A reasonable jury would not have construed CALJIC No. 8.66.1 to mean that it could find Alcarez committed attempted murder merely because he and Fajardo placed members of the group at risk of harm.

Moreover, the trial court properly instructed the jury on the elements of attempted murder with CALJIC No. 8.66, which included the specific intent requirement, as well as instructed it to consider the instructions as a whole and in light of all the others. We presume the jurors understood and followed the trial court's instructions. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1005.) A reasonable jury, considering these instructions in conjunction with CALJIC No. 8.66.1, would not conclude that it could find Alcarez guilty of attempted murder merely based on the conclusion that he or the actual perpetrator exposed the

16

members of the group to a risk of harm. (Cf. *People v. Bragg* (2008) 161 Cal.App.4th 1385, 1395-1396 [finding that jury was not misled by use of phrase "zone of harm" used in the analogous "kill zone" instruction CALCRIM No. 600, which provided that "'[a] person may intend to kill a specific victim or victims and at the same time intend to kill anyone in a particular zone of harm or "kill zone"'"]; *People v. Campos* (2007) 156 Cal.App.4th 1228, 1243 [finding no possibility that the jury could have misapplied CALCRIM No. 600 so as to fail to find that defendant had the specific intent to kill the victim, in part where the jury was instructed on the elements of attempted murder, including the requirement of the specific intent to murder the victim].)

In sum, we reject Alcarez's contention that CALJIC No. 8.66.1 permitted the jury to find him guilty of attempted murder without finding that he, or at least Fajardo, had the specific intent to murder the seven victims who survived the shooting.

### C. *CALJIC No. 8.66.1 As Argumentative*

Alcarez also argues that CALJIC No. 8.66.1 is impermissibly argumentative because it includes the phrase "kill zone." He likens the phrase to the inflammatory phrases "execution style" or "serial killer" and suggests that its use in the instruction is gratuitous and unnecessary.

Alcarez does not cite any favorable authority to support his contention. The only court to consider the issue in a published opinion, *Campos, supra,* 156 Cal.App.4th 1228, soundly rejected the same argument with respect to CALCRIM No. 600, an analogous kill zone instruction, finding as follows: "An instruction is argumentative when it recites facts drawn from the evidence in such a manner as to constitute argument to the jury in the guise of a statement of law. [Citation.] 'A

17

jury instruction is [also] argumentative when it is "'of such a character as to invite the jury to draw inferences favorable to one of the parties from specified items of evidence.' [Citations.]"' [Citation.] [¶] CALCRIM No. 600 merely employs a term, 'kill zone,' which was coined by our Supreme Court in *Bland* and referred to in later California Supreme Court cases. [Citation.] It does not invite inferences favorable to either party and does not integrate facts of this case as an argument to the jury. Other disparaging terms, including 'flight' (CALJIC No. 2.52), 'suppress[ion] of evidence' (CALJIC No. 2.06) and 'consciousness of guilt' (CALJIC No. 2.03) have been used in approved, longstanding CALJIC instructions. We see nothing argumentative in this instruction." (*Campos, supra*, 156 Cal.App.4th at p. 1244.) We agree with *Campos* that the phrase "kill zone" is not argumentative and it is not reasonably possible that the phrase would cause the jury to be biased against Alcarez.

II. *Cruel and Unusual Punishment*

Alcarez contends that the imposition of eight consecutive firearm enhancement terms of 25 years to life, pursuant to section 12022.53 subdivision (d), constituted cruel and unusual punishment. A punishment is excessive in violation of the Eighth Amendment to the federal Constitution if it is grossly disproportionate compared to the severity of the crime. (*People v. Dillon* (1983) 34 Cal.3d 441, 450, 478.)

Alcarez's cruel and unusual punishment claim is forfeited because he failed to advance it below. (*People v. Collins* (2004) 115 Cal.App.4th 137, 156; see *People v. Norman* (2003) 109 Cal.App.4th 221, 229 [cruel and unusual punishment arguments require examination of the offense and the offender and thus the issue

18

must be raised in the trial court]; *People v. DeJesus* (1995) 38 Cal.App.4th 1, 27.) Even if the claim was not forfeited, however, we would find it meritless.

Section 12022.53 subdivision (d) provides, in relevant part, that a person who personally and intentionally discharges a firearm and proximately causes great bodily injury or death, to any person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life. Further, "[s]ubdivision (e) of section 12022.53 authorizes imposition of the enhanced sentence on an aider and abettor if a criminal street gang allegation is pled and proved, as it was here." (*People v. Gonzales* (2001) 87 Cal.App.4th 1, 11-12 (*Gonzales*).) Section 12022.53, subdivision (e) "is expressly drafted to extend the enhancement for gun use in any enumerated serious felony to gang members who aid and abet that offense in furtherance of the objectives of a criminal street gang." (*Id.* at p. 15.) "Life sentences pass constitutional muster for those convicted of aiding and abetting murder, and for those guilty of felony murder who did not intend to kill. [Citations.] Additionally, a sentence enhancement of 25 years to life is not disproportionate to a violation of Penal Code section 12022.53; the Legislature has determined that a significant increase in punishment is necessary and appropriate to protect citizens and deter violent crime." (*People v. Em* (2009) 171 Cal.App.4th 964, 972-973.) Alcarez concedes that he met the conditions under subdivisions (d) and (e) of section 12022.53 and thus was subject to the imposition of consecutive enhancements of 25 years to life under those provisions.

Alcarez first contends that 25-year-to-life firearm enhancement under section 12022.53 is facially unconstitutional because the statute "does not recognize significant gradations of culpability depending on the severity of the current offense, fails to take mitigating factors into consideration, and arbitrarily

19

imposes severe punishment in cases involving criminal use of a gun as compared to the use of other dangerous or deadly weapons." He also argues that section 12022.53, subdivision (d) is arbitrary and capricious "because it imposes the harsh punishment of a 25-years-to-life enhancement upon mere aiders and abettors who may not even be aware that the perpetrator is armed with a firearm."

Courts have consistently rejected the first argument made by Alcarez that section 12022.53 is unconstitutional because it does not recognize gradations of culpability or take into account mitigating factors. (E.g., *People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1214-1215 (*Zepeda*); *People v. Martinez* (1999) 76 Cal.App.4th 489, 495 (*Martinez*).) In *Martinez*, this court held that "[s]ection 12022.53 as a whole represents a careful gradation by the Legislature of the consequences of gun use in the commission of serious crimes. The section is limited, in the first place, to convictions of certain very serious felonies. . . . The statute then sets forth three gradations of punishment based on increasingly serious types and consequences of firearm use in the commission of the designated felonies: 10 years if the defendant merely used a firearm, 20 years if the defendant personally and intentionally discharged it, and 25 years to life if the defendant's intentional discharge of the firearm proximately caused great bodily injury. Furthermore, the provision in question is an enhancement to the base term for the underlying conviction; a trial court retains flexibility as to fixing the underlying base term for attempted murder. [Citation.]" (*Martinez, supra*, 76 Cal.App.4th at p. 495; see *Zepeda, supra*, 87 Cal.App.4th at pp. 1214-1215.)

This court in *Martinez* also rejected the argument that section 12022.53 arbitrarily imposes severe punishment in cases involving criminal use of a gun as compared to the use of other dangerous or deadly weapons. We explained that "the Legislature determined in enacting section 12022.53 that the use of firearms in

20

commission of the designated felonies is such a danger that, 'substantially longer prison sentences must be imposed . . . in order to protect our citizens and to deter violent crime.' The ease with which a victim of one of the enumerated felonies could be killed or injured if a firearm is involved clearly supports a legislative distinction treating firearm offenses more harshly than the same crimes committed by other means, in order to deter the use of firearms and save lives. [Citations.]" (*Martinez, supra*, 76 Cal.App.4th at pp. 497–498; see *Gonzales, supra*, 87 Cal.App.4th at p. 18; *Zepeda, supra*, 87 Cal.App.4th at p. 1215.)

We further reject Alcarez's contention that section 12022.53, subdivision (d) is facially unconstitutional because it imposes a 25-years-to-life enhancement upon aiders and abettors "who may not even be aware that the perpetrator is armed with a firearm." We have previously found that "[t]he Legislature has chosen to severely punish aiders and abettors to crimes by a principal armed with a gun committed in furtherance of the purposes of a criminal street gang. It has done so in recognition of the serious threats posed to the citizens of California by gang members using firearms." (*Gonzales, supra*, 87 Cal.App.4th at p. 19; see *id.* at p. 15.) Alcarez's facial challenge to section 12022.53, subdivisions (d) and (e) based on the aider and abettor's potential lack of awareness of the existence of a firearm is therefore not well-taken.

We further reject Alcarez's related argument that the firearm enhancements were cruel and unusual as applied to him, because, he asserts, there was no jury finding that he was aware that Fajardo was armed with a gun during the time in which he was alleged to be involved in aiding and abetting conduct. Not only has the Legislature reasonably concluded that aiders and abettors of gang violence should be treated the same as the actual perpetrator under section 12022.53, but it

21

is not correct that the jury in this case made no finding that Alcarez knew about the gun.

The jury was instructed with CALJIC No. 3.02 that in order to be liable as an aider and abettor of the "target" crime of assault with a firearm, Alcarez had to have "knowledge of the unlawful purpose of the perpetrator." Thus, in finding Alcarez guilty of murder and attempted murder, as the natural consequences of the target crime of assault with a firearm, the jury necessarily concluded that Alcarez had knowledge that Fajardo intended to use a firearm to commit assault. This implicit finding was supported by substantial evidence, as Alcarez initially admitted during his interview with police that he knew that Fajardo had gone to get a gun before he set off with him to act as a lookout, and later corrected himself to state that he did not know Fajardo had a gun until just before they arrived at the location of the shooting. Under either version of his story, he knew that Fajardo had a gun by the time he acted as his lookout while Fajardo commenced his assault.

In sum, we reject both the facial and as applied challenges under the Eighth Amendment to the imposition of 25-years-to-life enhancements under section 12022.53, subdivision (d). Further, because Alcarez's sentence was not cruel and unusual, his trial counsel's failure to object to it did not constitute ineffective assistance of counsel.

III. *Corrections to Abstract of Judgment*

Alcarez further contends, and the Attorney General concedes, that the abstract of judgment erroneously states that Alcarez was convicted of attempted *willful, deliberate, and premeditated* murder in counts 2 through 8. Although the jury found Alcarez guilty of seven counts of attempted murder, it found not true

22

the allegations that the offenses were willful, deliberate, and premeditated. Therefore, we order the abstract of judgment corrected to delete the notations suggesting that the attempted murders in counts 2 through 8 were willful, deliberate and premeditated.

In addition, Alcarez contends, and the Attorney General agrees, that the abstract of judgment does not correctly reflect the trial court's ruling with respect to the victim restitution fine. The trial court ordered that a $7,029.71 restitution fine ($6,879.71 to the State Victim Compensation Board and $150 to Charlene Lovette) pursuant to section 1202.4, subdivision (f). However, the abstract of judgment does not indicate the amount to be paid to Lovette. Therefore, we order the abstract of judgment amended to reflect that Lovett is to be paid $150, and that the codefendants are jointly and severally liable for the victim restitution fines.

IV. *Remand for Resentencing*

Finally, we note a sentencing error not raised by the parties. For each attempted murder count (counts 2 through 8), the trial court incorrectly imposed one-third the midterm, plus enhancements, to run consecutive to the indeterminate term for the murder count (count 1). However, "[g]enerally, indeterminate term crimes and determinate term crimes are subject to different sentencing schemes. [Citation.] 'Such sentencing has been conceptualized as sentencing in separate boxes.' [Citation.] The trial court separately determines the sentences to be imposed for each category of crime, and then 'combines the two to reach an aggregate total sentence. Nothing in the sentencing for the determinate term crimes is affected by the sentence for the indeterminate term crime[s].' [Citation.] When the defendant is sentenced to determinate and indeterminate terms, the determinate term is served first." (*People v. Rodriguez* (2012) 207 Cal.App.4th

23

204, 211.) In the instant case, under section 1170.1, the court should have chosen a determinate term for one of the attempted murder counts from the triad of available sentences for that crime (5, 7, or 9 years (§ 664)) plus applicable enhancements, and then, consecutive to *that term*, imposed terms of one-third the midterm (plus enhancements) for the remaining attempted murder counts. The court then should have combined the sentences on those counts with the indeterminate term (plus the applicable enhancement) for the murder count (count 1) to reach a total aggregate sentence, with the determinate sentence on the attempted murder counts to be served first. Because an illegal sentence can be corrected at any time (*People v. Reyes* (1989) 212 Cal.App.3d 852, 857), we must remand for resentencing.

## DISPOSITION

The case is remanded for resentencing. On remand, the court shall choose a determinate term for one of the attempted murder counts (plus applicable enhancements), and then impose terms of one-third the midterm (plus enhancements) for the remaining attempted murder counts. The court shall then combine the sentence on the attempted murder counts with the indeterminate sentence on the murder count to reach a total aggregate sentence, with the determinate sentence on the attempted murder counts to be served first.

24

In addition, on the new abstract of judgment, which shall be forwarded to the Department of Corrections and Rehabilitation, the trial court is directed to: (1) delete any notation that the attempted murders in counts 2 through 8 were willful, deliberate and premeditated, and (2) show that Charlene Lovett is to receive $150 in victim restitution in addition to the $6,879.71 to be paid to the State Victim Compensation Board, and to show that Alcarez and his codefendants are jointly and severally liable for both these victim restitution payments. In all other respects, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

WILLHITE, Acting P. J.

We concur:

MANELLA, J.

SUZUKAWA, J.

25