Filed 7/21/14  P. v. Phung CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>TIEN PHUOC PHUNG,<br><br>    Defendant and Appellant. | G048108<br><br>(Super. Ct. No. 11WF0963)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, James A. Stotler, Judge.  Affirmed in part, reversed in part.

Athena Shudde, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Lynne G. McGinnis and Eric A. Swenson, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A confrontation between rival gang members outside a pool hall led to a brief car chase, which culminated when a passenger in a pursuing vehicle fired a gun out of the window at the fleeing vehicle. The gunshots resulted in the death of one victim and the serious injury of another. A jury convicted defendant Tien Phuoc Phung (who was not the shooter, or even in the vehicle from which the bullets issued) of all four counts with which he was charged: (1) first degree murder (Pen. Code, §§ 187, subd. (a), 189);[1] (2) attempted murder (§§ 187, subd. (a), 664); (3) shooting at an occupied motor vehicle (§ 246); and (4) street terrorism (§ 186.22, subd. (a)). As to each of the first three counts, the jury found it to be true that defendant committed the offense for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)) and that defendant vicariously discharged a firearm causing great bodily injury and death (§ 12022.53, subds. (d), (e)(1)). The court sentenced defendant to 50 years to life in state prison.

Pursuant to *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*), we reverse defendant's conviction for first degree murder because the jury was instructed that it could convict defendant of first degree murder based on a natural and probable consequences theory of aiding and abetting. We also modify the judgment to remedy an inconsequential sentencing error (the court should not have imposed then stayed § 186.22, subd. (b)(1)(C), enhancements). We otherwise affirm the judgment.

FACTS

*Background*

Detective Peter Vi testified as an expert witness on the subject of criminal street gangs. Vi had been assigned to the gang unit of his department for 18 years. Vi

---

[1] All statutory references are to the Penal Code.

2

talked about gangs generally, indicating "[t]hey use violence, intimidation to gain . . . respect." Firearms "elevate the status" of the individual employing them because it gives the individual more power. A "hit-up" occurs when a gang member asks another individual a question (such as "where are you from, what gang you claim, do you bang"), which oftentimes serves as an invitation or prelude to a violent confrontation. Gang members "claim" their membership in the gang during confrontations because of pride in their gang and to inform the victims of who is behind the attack. If a gang member or gang has been disrespected by a rival, retaliation of equal or greater measure must occur to regain the lost respect. Gang members are expected to support each other in violent confrontations and are subjected to punishment from their own gang if they fail to live up to their responsibilities. "Backup" in confrontations with rival gangs is very important because there is strength in numbers, both in actual fights and for intimidation purposes.

Vi opined that Tiny Rascals Gang (Tiny Rascals or T.R.G.) was a criminal street gang on the date of the incident in question. Based on defendant's numerous prior interactions with police in which he admitted to his membership in Tiny Rascals, defendant's tattoo with T.R.G. symbolism, Vi's personal interactions with defendant, defendant's videotaped participation in "jumping in" gang ceremonies (pursuant to which the new member is beaten up by existing members), photographs depicting defendant displaying T.R.G. hand signs, and the investigation of this case, Vi opined that defendant was an active participant in Tiny Rascals when the crimes at issue occurred. Indeed, defendant admitted to another officer that he was a "lieutenant" in Tiny Rascals (i.e., in between the "shot callers" at the top and younger members). And a nonpolice witness testified defendant was a T.R.G. member. Vi also opined that a hypothetical crime, like the actual crime described below, would have been committed for the benefit of, at the direction of, and in association with a criminal street gang. The parties stipulated that Tiny Rascals had engaged in a pattern of criminal activity prior to the crimes at issue.

3

Two allied gangs were involved in the pursuit of the victims' car, Tiny Rascals and Hellside (T.R.G.'s ally since 2009). The victims in this case were linked to three allied gangs, all rivals of Tiny Rascals and Hellside: Viet Together (also known as V.T.), Power of Viet (also known as P.O.V.), and Asian Family (also known as A.F.).

Antipathy characterized the relations between, on the one hand, Tiny Rascals and Hellside, and, on the other hand, their rivals Viet Together, Asian Family, and Power of Viet. Prior to the incident in question, the gangs had perpetrated acts of vandalism against their rivals' residences (cleverly referred to as "playing house"). The week before the incident, a fistfight occurred at a karaoke restaurant. Defendant stared menacingly ("mad dogged") and punched an individual in the face. Someone said, "This is T.R.G. You guys got shit." Someone else said, "Fuck Asian Family." According to defendant (speaking in another context), one of Tiny Rascals' goals was to make Viet Together "die out."

Phi Hong Pool Hall (the pool hall) was a hangout for members of Viet Together, Asian Family, and Power of Viet. Defendant and the other Tiny Rascals were aware that the pool hall was an area claimed by those rival gangs. Defendant did not like to go there; he had been jumped (i.e., physically attacked) at this location by members of a different gang (not the gangs at issue in this case) in the past.

*Violence Leading to Charges*

On the night of the incident in question, there was a party at the home of Andrew Tran, an individual with ties to Tiny Rascals. Approximately 15 to 20 people attended. About half the males at the party were members of Tiny Rascals, about half were members of Hellside. Some of the attendees angrily discussed recent incidents involving their rivals, Asian Family, Viet Together, and Power of Viet. Tran was angered by a recent fight, and others were in turn riled up by the discussion. The party broke up around midnight, as various individuals went out to eat. In Tran's car were a

4

teenage girl related to Tran, Tran's cousin, and two of Tran's friends. When they were leaving the party, one of Tran's friends put a gun into the car. Ultimately, this group went to the pool hall. Tran's relatives stayed in the car while the others got out.

At approximately 2:00 a.m., outside the pool hall on March 20, 2011, between four and seven vehicles were blocking the path out of the parking lot. One of the cars at the pool hall was driven by defendant. The people in the cars were the same people who were at the T.R.G./Hellside party earlier in the night. One of the passengers in defendant's car, Anthony Nguyen, knew there was a plan to lure rival gang members outside to fight. Defendant and others would use their cars as a roadblock to prevent the victims from leaving the pool hall parking lot. Defendant never got out of his car at the pool hall.

Two groups of males (one group with about six individuals, the other with about eight individuals) were standing outside yelling at each other. Someone shouted, "Fuck A.F." People were yelling, "Fuck V.T." and "Fuck Asian Family." Scottie Bui yelled, "P.O.V." Someone else said, "T.R.G."

The plan to prevent the rival gang members from leaving changed when Tiny Rascals and Hellside members determined someone in the other group had a gun. When Tran got back in his car, he said a gang was there. The eight males affiliated with Viet Together, Power of Viet, and Asian Family piled into a sports utility vehicle (SUV). When a SUV passed his automobile, Tran said, "That's them." Tran's car followed the vehicle. A number of cars sped out of the parking lot. There were probably five or more cars. Defendant drove his car out of a different exit than the other cars, but turned right and tried to catch up with his friends.

The individual in the front passenger seat of Tran's car, Benjamin Nguyen, rolled down his window and told Tran to accelerate. Benjamin Nguyen yelled at the SUV, asking whether they were in a gang. Three to five gunshots were fired by Benjamin Nguyen. The shooting occurred approximately 150 to 400 yards from the pool

5

hall parking lot. Scottie Bui was shot and killed. Roger James was shot and suffered great bodily injury. Defendant's car was approximately 50 to 60 yards from where the shooting occurred.

At least some of the Tiny Rascals and Hellside affiliated individuals involved in the confrontation (including defendant) met at the residence of a Hellside member, Tony Ngo. People talked about the fact that a shooting occurred. It was stated at this meeting that everyone should "lay low" and not mention the incident.

*Defendant's Admissions and Deceitful Statements to Police*

When defendant was interviewed by a police officer later in the day of the shooting (March 20, 2011), defendant stated that he was at a girlfriend's house all night, starting at noon the previous day. Defendant claimed his car was not running due to tire or axle problems. Defendant was able to identify a photograph of victim Bui by his nickname and his gang affiliation with Power of Viet. Defendant was also able to identify a photograph of victim James by his first name and his gang affiliation with either Asian Family or Power of Viet.

After the officer investigated defendant's alibi, the officer confronted defendant with the results of his investigation. Defendant admitted he had lied about being at a girlfriend's house. Defendant admitted he had asked the girlfriend and her mother to lie about his presence. Defendant then claimed he received a phone call directing him to the pool hall from Tran to provide "backup"; defendant heard arguing and individuals claiming gang membership in the background of the phone call. Defendant drove to the pool hall location, but arrived after "it had happened." Defendant admitted he was aware that Hellside and Tiny Rascals gang members were together earlier that night and that Hellside members had guns. Defendant denied that any Tiny Rascals had firearms on the night in question.

6

About a month after the incident, defendant was interviewed a third time, having been arrested and read his rights. Defendant admitted he was at the party at Tran's house with many individuals from Tiny Rascals and Hellside. Defendant agreed there was sentiment expressed at the party about the commission of violence against their gang rivals: "I mean, people were drinking, I mean, they did say like, oh yeah, fuck POV, fuck VT, but it wasn't like oh, yeah, let's go out and look for them. It was just like, man, fuck those fools, this and that. Or like, oh, if I catch those guys doing, I'll shoot 'em or I'll beat 'em up, you know, like people were talking 'cause they were drinking." According to defendant, it was "[m]ainly the Hellside guys." Defendant left the party to go to an establishment known as a hangout for rival gangs, Volcano Tea. The officer asked defendant, "What's gonna happen if you see them there, Tien?" Defendant responded, "Yeah. The guys in my car are gonna try — probably try to bang on them."

Right after defendant received a phone call about the pool hall, there were people that wanted to go. Defendant drove his car to the pool hall. Defendant agreed ("Yeah") with the officer's premise that by going to the pool hall defendant "knew that at least a fucking brawl was going to happen." Defendant agreed it was true he went to the pool hall to backup the Tiny Rascals. Defendant stated, "I mean two groups and both sides have weapons, yeah, someone's gonna get hurt hard." Defendant knew it was going to be bad when Hellside members started opening their vehicle trunks; defendant assumed they were retrieving weapons. Hellside members had talked at the party about having guns. Benjamin Nguyen and someone named Dung had guns. When the cars started pulling out onto the street, defendant chased the group in his car. Defendant "knew . . . after everything's done like we just happen to stop chasing them, we're going to meet somewhere down there anyways." "I knew it wasn't over because nothing happened and then, when I turn out to this corner, yeah, I could of went straight, I could have made a left but, I mean, everyone's going this way. All my homies going this way." After the shooting happened, Dung told defendant to get out of the area. The group later

7

met up at someone's house, where two individuals criticized Benjamin Nguyen for missing.

At the conclusion of the interview, defendant asked, "Is there a way I could get out of this?" and "so, there's no way you could help me out?"

## DISCUSSION

The prosecutor argued and the jury was instructed with three theories of liability with regard to the murder of Bui, the attempted murder of James, and discharging a firearm at an occupied vehicle: (1) defendant aided and abetted these crimes; (2) defendant aided and abetted a different crime (i.e., "disturbing the peace by challenging someone to fight and/or assault with a deadly weapon"), the natural and probable consequence of which was the commission of the charged offenses; and (3) defendant entered into a conspiracy to commit a crime, the natural and probable consequence of which was the commission of the charged offenses.

Defendant claims the jury instructions provided with regard to these theories were erroneous. Defendant did not challenge the relevant instructions below. (See *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1163 [party forfeits challenge to instructions that correctly state the law in general, even if the instructions are misleading in the particular case].) We address the merits of his contentions of instructional error, both because defendant contends the alleged errors affected his substantial rights (§ 1259) and because defendant argues in the alternative that he received ineffective assistance of counsel with regard to the jury instructions.

Defendant also asserts that there was insufficient evidence to support any of his convictions and that the court erred by imposing (then staying) section 186.22, subdivision (b)(1)(C), enhancements.

8

*Instructions on Aiding and Abetting Liability*

The first question presented is whether the pertinent CALCRIM form instructions on direct aiding and abetting liability (CALCRIM Nos. 401, 402) adequately state the law with regard to establishing defendant's mens rea.

We begin with an exposition of relevant legal principles. "'All persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, . . . . are principals in any crime so committed.' [Citations.] Thus, a person who aids and abets a crime is guilty of that crime even if someone else committed some or all of the criminal acts. [Citation.] Because aiders and abettors may be criminally liable for acts not their own, cases have described their liability as 'vicarious.' [Citation.] This description is accurate as far as it goes. But . . . the aider and abettor's guilt for the intended crime is not entirely vicarious. Rather, that guilt is based on a combination of the direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1116-1117.)

Thus, assuming the natural and probable consequences doctrine is inapplicable, an aider and abettor can be guilty of the same crime as the perpetrator, or a greater or lesser crime than the perpetrator, depending on the respective mental states of the various principals. (See *People v. McCoy*, *supra*, 25 Cal.4th at pp. 1117, 1122; *People v. Loza* (2012) 207 Cal.App.4th 332, 351-355.) Examples illustrate this phenomenon better than generalities. The more unlikely scenario is one in which the perpetrator has a lower level of liability than the aider and abettor. Two individuals shoot at a victim, but the one who actually hits the victim has an unreasonable self-defense theory, potentially reducing his criminal liability below that of the aider and abettor. (*People v. McCoy*, *supra*, 25 Cal.4th at p. 1122.) Iago maliciously induces and encourages Othello (who it might be posited is acting in the heat of passion) into killing Desdemona, rendering the aider and abettor guilty of first degree murder but the

9

perpetrator guilty of manslaughter. (*Id*. at pp. 1121-1122.) More commonly, perhaps, aiders and abettors can be held liable for lesser crimes than the actual perpetrator. A spouse provides assistance to her husband during a violent confrontation, which ends in her husband committing first degree murder; the jury must determine the wife's intent in assisting her husband during the incident. (*People v. Loza*, *supra*, 207 Cal.App.4th at pp. 336, 356.) A street fight ends in the stabbing death of one of the combatants; the victor's sister, present at the scene and accused of assisting her brother, might bear less responsibility than her brother. (*People v. Nero* (2010) 181 Cal.App.4th 504, 507-508, 519.)

Defendant suggests the following standard CALCRIM instructions do not make clear the jury's obligation to focus on the aider and abettor's mens rea for purposes of direct aider and abettor liability. "A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator, who directly committed the crime. A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator. . . ." (CALCRIM No. 400.) "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] AND [¶] 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. [¶] Someone *aids and abets* a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime. . . ." (CALCRIM No. 401.)

10

Relying primarily on a case that has since been depublished as a result of a grant of review on a different issue,[2] defendant claims the form instructions (CALCRIM Nos. 400, 401) allow the jury to utilize the mens rea of the perpetrators (the shooter, Benjamin Nguyen, in particular) to convict defendant. We see no plausible theory pursuant to which these instructions are problematic as to defendant's convictions for attempted murder[3] and willfully discharging a firearm at an occupied vehicle.[4] CALCRIM No. 401 clearly requires the jury to find that defendant knew the perpetrator (Benjamin Nguyen) intended to commit these crimes and that defendant intended to aid and abet Benjamin Nguyen in the commission of these crimes. Defendant does not explain, and we cannot divine, how the instructions could be read as an invitation to hold defendant vicariously liable for Benjamin Nguyen's mental state on these counts.

As the previously listed examples of divergent liability suggest, however, murder is particularly problematic in the aiding and abetting context because the same conduct constitutes different crimes (e.g., first degree murder, second degree murder,

---

[2] *People v. Ramirez*, review granted Dec. 18, 2013, S214133.

[3] The court instructed the jury with CALCRIM No. 600, which states in relevant part: "The defendant is charged in Count 2 with attempted murder. [¶] To prove that the defendant is guilty of attempted murder, the People must prove that: [¶] 1. The defendant took at least one direct but ineffective step toward killing another person; [¶] AND [¶] 2. The defendant intended to kill that person. . . ." We note that the attempted murder count did not include an allegation that the attempted murder was "willful, deliberate, and premeditated." (§ 664, subd. (a).) Even if it had, section 664, subdivision (a), "properly interpreted, does not require *personal* willfulness, deliberation, and premeditation on the part of an attempted murderer." (*People v. Lee* (2003) 31 Cal.4th 613, 616-617.)

[4] The court instructed the jury with CALCRIM No. 965, which states in relevant part: "The defendant is charged in Count 3 with shooting at an occupied motor vehicle. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant willfully and maliciously shot a firearm; [¶] AND [¶] 2. The defendant shot the firearm at an occupied motor vehicle."

11

voluntary manslaughter) depending on the mental state of the principals. The jury in this case was tasked with deciding whether defendant was guilty of first degree or second degree murder pursuant to CALCRIM Nos. 520, 521, and 640. In murder cases, particularly those in which both the perpetrator and aider and abettor are being tried at the same time, there is a danger that a careless rendering of the CALCRIM instructions could confuse the jury as between the aider and abettor's mens rea and that of the perpetrator. The instructions pertaining to murder required the jury to find "the defendant" committed the crimes at issue. Of particular importance is CALCRIM No. 521, which provides in relevant part: "The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. The defendant acted *willfully* if he intended to kill. The defendant acted *deliberately* if he carefully weighted the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with *premeditation* if he decided to kill before completing the act that caused death." Obviously, defendant did not "complet[e] the act that caused death." This instruction could have confused the jury had defendant and Benjamin Nguyen been on trial at the same time. The unexplained use of the general term "the defendant" in these instructions may be inappropriate in a multiple defendant aiding and abetting case.

Here, however, defendant was the only individual on trial. When reviewing the direct aiding and abetting instructions in conjunction with the substantive murder instructions, the jury could only conclude that it needed to focus on defendant's mens rea for purposes of direct aiding and abetting liability. CALCRIM No. 640 also helpfully sets forth the process for the jury to follow in determining whether "the defendant" (not Benjamin Nguyen) was guilty of first degree murder, second degree murder, or not at all with regard to count 1. "We determine the correctness of the jury instructions from the entire charge of the court, not from considering only parts of an instruction or one particular instruction." (*People v. Smith* (2008) 168 Cal.App.4th 7, 13.) There is no

12

reasonable likelihood the jury was confused by the instructions or applied them incorrectly in the manner contended by defendant. (See *People v. Young* (2005) 34 Cal.4th 1149, 1202-1203.)[5]

*Instructions on Aiding and Abetting With Natural and Probable Consequences Doctrine*

Defendant also claims the jury instructions (those cited above in conjunction with CALCRIM No. 403) were prejudicially erroneous with regard to the prosecutor's theory that the charged crimes were the natural and probable consequences of uncharged crimes that defendant aided and abetted.

---

[5] During deliberations, the jury sent a note to the trial court asking for "exact language describing definitions of 1st degree and 2nd degree murder." After consulting with counsel, the court responded, "The exact language describing definitions of 1st degree and 2nd degree murder is contained in CALCRIM Instruction No. 520 and 521." The jury later sent a second note, indicating that it was unable to "find an explicit definition to determine the difference between 1st and 2nd degree murder as per 520 and 521." After again consulting with counsel, the trial court provided the following explanation: "For purposes of this case, first degree murder is the unlawful killing of a human being with malice aforethought. For first degree murder, express malice is required, *i.e.*, an intent to kill, and, such intent to kill must be accompanied by a killing done with premeditation and deliberation. Premeditation and deliberation is explained in CALCRIM 521. [¶] Second degree murder, again for purposes of this case, is the unlawful killing of a human being with malice aforethought. Second degree murder can result when: [¶] 1. There is an unlawful intent to kill, *i.e.*, express malice, but the act of killing is done without premeditation and deliberation or insufficient evidence of premeditation and deliberation. [¶] 2. Second degree murder can also be the unlawful killing of a human being based on 'implied' malice, *i.e.*, (1) If the unlawful act of killing is intentionally done; and (2) The natural and probable consequences of the act were dangerous to human life; and (3) At the time the person committed the act, he knew his act was dangerous to human life; and (4) He deliberately acted with conscious disregard for human life." These questions and responses do not suggest any confusion on the part of the jury with regard to their obligation to examine defendant's mental state as part of an inquiry into direct aiding and abetting liability. (Cf. *People v. Nero*, *supra*, 181 Cal.App.4th at p. 519 [jury expressly asked about possibility of aider and abettor being held liable for lesser crime, which questions were erroneously addressed by court's statement that "'[e]ach principal . . . is *equally guilty*'"]; *People v. Loza*, *supra*, 207 Cal.App.4th at pp. 353-355 [follows *Nero* in similar circumstances].)

13

"[A] defendant may be held criminally responsible as an accomplice not only for the crime he or she intended to aid and abet (the target crime), but also for any other crime that is the 'natural and probable consequence' of the target crime." (*People v. Prettyman* (1996) 14 Cal.4th 248, 261.) A jury "must find that the defendant, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of a predicate or target offense; (3) by act or advice aided, promoted, encouraged or instigated the commission of the target crime[;] (4) the defendant's confederate committed an offense *other than* the target crime; and (5) the offense committed by the confederate was a natural and probable consequence of the target crime that the defendant aided and abetted." (*Id*. at p. 262, fn. omitted.)

A charged crime is a natural and probable consequence of a target crime if it was reasonably foreseeable that the charged crime would be committed. "The . . . question is not whether the aider and abettor *actually* foresaw the additional crime, but whether, judged objectively, it was *reasonably* foreseeable." (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1133.)

Thus, under this theory of the case, the prosecutor did not need to prove defendant had any subjective knowledge or intent that a murder, attempted murder, or discharge of a firearm would occur. It was enough to prove that defendant intended to (and actually did) aid and abet one of the target offenses, and that the crimes actually committed by Benjamin Nguyen were natural and probable consequences of the target offense. Hence, the relevant mens rea for purposes of murder, attempted murder, and discharge of a firearm at an occupied vehicle was that of Benjamin Nguyen, not that of defendant. Defendant's mental state was only relevant to proving his intent to aid and abet the target offenses.

The jury was instructed with CALCRIM No. 403, modified to include pertinent crimes as follows: "*Before you may decide whether a defendant is guilty of first*

14

*degree murder, second degree murder*, attempted murder, or shooting at an occupied motor vehicle on the natural and probable consequences doctrine of aiding and abetting law, you must decide whether he is guilty of disturbing the peace by challenging someone to fight and/or assault with a deadly weapon.  [¶]  *To prove that the defendant is guilty of first degree murder, second degree murder*, attempted murder, or shooting at an occupied motor vehicle, the People must prove that:  [¶]  1. The defendant is guilty of disturbing the peace by challenging someone to fight and/or assault with a deadly weapon;  [¶]  2. During the commission of disturbing the peace by challenging someone to fight and/or assault with a deadly weapon *a coparticipant* in that disturbing the peace by challenging someone to fight and/or assault with a deadly weapon *committed the crime of first degree murder, second degree murder,* attempted murder, or shooting at an occupied motor vehicle;  [¶]  AND  [¶]  3. Under the circumstances, a reasonable person in the defendant's position would have known that the *commission of first degree murder, second degree murder,* attempted murder, or shooting at an occupied motor vehicle was a natural and probable consequence of the disturbing the peace by challenging someone to fight and/or assault with a deadly weapon.  A coparticipant in a crime is the perpetrator or anyone who aided and abetted the perpetrator.  It does not include a victim or innocent bystander.

"A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes.  In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence.  *If the first degree murder, second degree murder*, attempted murder, or shooting at an occupied motor vehicle, was committed for a reason independent of the common plan to commit the disturbing the peace by challenging someone to fight and/or assault with a deadly weapon, *then the commission of the first degree murder, second degree murder*, attempted murder, or shooting at an occupied motor vehicle was not a natural and probable consequence of disturbing the peace by challenging someone to

15

fight and/or assault with a deadly weapon. [¶] To decide whether the crime of *first degree murder, second degree murder*, attempted murder, or shooting at an occupied motor vehicle was committed, please refer to the separate instructions that I will give you on those crimes. [¶] The People are alleging that the defendant originally intended to aid and abet disturbing the peace by challenging someone to fight and/or assault with a deadly weapon. [¶] If you decide that the defendant aided and abetted one of these crimes and that *first degree murder, second degree murder*, attempted murder, or shooting at an occupied motor vehicle was a natural and probable consequence of that crime, the defendant is guilty of *first degree murder, second degree murder*, attempted murder, or shooting at an occupied motor vehicle. [¶] You do not need to agree about which of these crimes the defendant aided and abetted." (Italics added.)

According to defendant's initial argument as made in his briefs (again relying on a subsequently depublished opinion as referenced in fn. 2), this instruction "did not tell the jury the shooter's premeditation of the murder was a necessary element of the offense and [defendant's] liability for first degree murder required a determination of the shooter's premeditation as part of the natural and probable consequence of whatever lesser crime the jury determined that [defendant] himself had intended to commit. [Citation.] To the contrary, CALCRIM No. 403 permitted the jury to find [defendant] guilty of first degree murder based solely on the shooter's premeditation."

But defendant simply ignores the repeated references (italicized above) to both first degree murder and second degree murder in CALCRIM No. 403 as provided to the jury in this case. The jury was not provided with an undifferentiated reference to "murder" being a natural and probable consequence of the target offenses. (Cf. *People v. Favor* (2012) 54 Cal.4th 868, 882 (dis. opn. of Liu, J.) [jury "asked to determine only whether 'the commission of attempted murder was a natural and probable consequence of the commission of the robbery'" rather than *premeditated* attempted murder].) Instead, the logical path blazed for the jury by the version of CALCRIM No. 403 in this case was

16

to determine which, if any, of the charged crimes was a natural and probable consequence of the uncharged target offenses. In following this path, the jury would then naturally proceed to examine the separate instructions for the charged offenses. These instructions (including CALCRIM No. 521) accurately distinguish between the mental states required for first degree and second degree murder.

However, after the submission of this case and after we issued an opinion denying relief to defendant on the ground of instructional error, our Supreme Court published *Chiu*, *supra*, 59 Cal.4th 155. *Chiu* held "that an aider and abettor may not be convicted of first degree *premeditated* murder under the natural and probable consequences doctrine. Rather, his or her liability for that crime must be based on direct aiding and abetting principles." (*Id*. at pp. 158-159.) We granted defendant's petition for rehearing and requested additional briefing from the parties. As conceded by the Attorney General, it was error to instruct the jury that defendant could be convicted of premeditated first degree murder under the natural and probable consequences doctrine. And, as further conceded by the Attorney General, this error was prejudicial. Our review of the entire record confirms the Attorney General's view that we cannot "conclude beyond a reasonable doubt that the jury based its verdict on the legally valid theory that defendant directly aided and abetted the premeditated murder." (*Id*. at p. 167.) Defendant's conviction for first degree murder must be reversed.

*Uncharged Conspiracy Instruction*

"Pursuant to section 182, subdivision (a)(1), a conspiracy consists of two or more persons conspiring to commit any crime. A conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act 'by one or more of the parties to such agreement' in furtherance of the conspiracy." (*People v. Morante* (1999) 20

17

Cal.4th 403, 416, fn. omitted.) Defendant was not charged with the separate crime of conspiracy in this case.

Defendant takes issue with the jury being charged with instructions (CALCRIM Nos. 416-420) pertaining to the prosecutor's third theory of liability, to wit, defendant entered into an uncharged conspiracy with Tiny Rascals and/or Hellside gang members to commit certain criminal acts (disturbing the peace by willfully fighting or challenging someone to fight), the natural and probable consequence of which was the charged offenses (murder, attempted murder, and discharging a firearm at an occupied vehicle).

As already stated, defendant cannot be convicted for premeditated first degree murder based on the natural and probable consequences doctrine. (*Chiu*, *supra*, 59 Cal.4th 155.) Thus, the conspiracy instructions are problematic to this extent. But defendant does not identify any other particular problem with these instructions or with the uncharged conspiracy theory being applied to the facts of this case. Instead, in a sprawling examination of hoary case law, defendant espouses the position that this theory of liability is unlawful generally as not authorized by the Penal Code or section 31 in particular.[6]

We are unwilling to engage with the merits of defendant's lengthy treatment of this issue. "It is long and firmly established that an uncharged conspiracy may properly be used to prove criminal liability for acts of a coconspirator." (*People v. Belmontes* (1988) 45 Cal.3d 744, 788, disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) "One who conspires with others to commit a felony is guilty as a principal." (*In re Hardy* (2007) 41 Cal.4th 977, 1025 [citing § 31].) We are

---

[6] "All persons concerned in the commission of a crime . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission . . . are principals in any crime so committed." (§ 31.)

18

required to follow the decisions of our Supreme Court. Defendant makes no effort in his opening brief to argue that the facts of this case fall outside of established Supreme Court authority; instead, defendant argues that courts (including our Supreme Court) have been mistaken about this issue.

*Sufficiency of the Evidence — All Counts*

Next, defendant asserts the evidence was insufficient to support each of his convictions. "In reviewing a challenge to the sufficiency of the evidence, 'we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence — evidence that is reasonable, credible and of solid value — such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'" (*People v. Alexander* (2010) 49 Cal.4th 846, 917.)

The direct and circumstantial evidence in this case can be summarized as follows: (1) defendant was a member of Tiny Rascals Gang; (2) Tiny Rascals and Hellside were allied against three rival gangs, Asian Family, Viet Together, and Power of Viet; (3) the two sides engaged in reciprocal vandalism and physical violence during the time period leading up to the night in question; (4) numerous Tiny Rascals and Hellside gang members, including defendant, were present at a party hours before the shooting; (5) defendant was aware that individuals at the party were in possession of guns; (6) the gang rivalry was discussed, including angry statements suggesting the rivals would be attacked; (7) Tiny Rascals and Hellside members spread out into the community; (8) eventually, defendant was contacted by Tran to come to the pool hall to provide "backup"; (9) defendant responded to the call, joining in with approximately five other cars partially blocking the parking lot exit; (10) some individuals from defendant's group (but not defendant or anyone in his car) got out of their cars and confronted a group of

19

approximately eight individuals affiliated with Asian Family, Viet Together, and Power of Viet; (11) when affiliates of defendant went to their trunks, defendant assumed they were retrieving guns; (12) numerous gang names were shouted, amounting to challenges to a violent confrontation; (13) a fight did not actually occur, perhaps because defendant's group feared that their rivals had a gun; (14) the two groups got into their respective cars; (15) the rivals' car was allowed to leave the parking lot; (16) numerous cars from defendant's group followed, including defendant, who used an alternate exit from the lot that left him behind the action; (17) with Tran driving, Benjamin Nguyen shot at the rivals' car a few hundred yards down the street, killing Bui and injuring James; and (18) Tiny Rascals and Hellside members, including defendant, met at a residence afterward and discussed the event.

It is certainly a fair inference from the record that defendant intended to aid and abet the uncharged target offenses of disturbing the peace by challenging someone to fight (§ 415, subd. (1); CALCRIM No. 2688) and/or assault with a deadly weapon (§§ 240, 245(a)(1); CALCRIM No. 875). By his own admission, defendant drove to the pool hall to provide "backup" to individuals he knew were armed. Anthony Nguyen, a passenger in defendant's car, knew there was a plan to engage in a fight. Regardless of whether defendant specifically agreed at the party to fight his gang's rivals that night, it cannot be denied that he answered the call from Tran to meet at the pool hall to assist in that purpose. Furthermore, defendant arrived early enough to observe what was happening (e.g., Hellside members opening their trunks) and to see the cars leaving the parking lot.[7]

There is also substantial evidence supporting a finding that defendant, "by act or advice," aided, promoted, and/or encouraged the target offenses. (*People v.*

---

[7] We also note that these same facts support the prosecution's uncharged conspiracy theory, in that defendant agreed to backup Tran and multiple overt acts were taken by Tiny Rascals and Hellside members to confront their rivals.

20

*Cooper* (1991) 53 Cal.3d 1158, 1164.)  "[I]n general[,] neither presence at the scene of a crime nor knowledge of, but failure to prevent it, is sufficient to establish aiding and abetting its commission.  [Citations.]  However, '[a]mong the factors which may be considered in making the determination of aiding and abetting are:  presence at the scene of the crime, companionship, and conduct before and after the offense.'"  (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409.)  As shown in the summary of the evidence above and the gang expert testimony, everything that happened before and after the actual shooting supports the conclusion that defendant aided, promoted, and encouraged the target offenses by providing backup to his allies.

It is typically a question for the jury as to whether murder is a reasonably foreseeable consequence of an assault or battery involving gang members.  (See *People v. Medina* (2009) 46 Cal.4th 919, 922-924 [killing of fleeing victim by one gang member's gunshot was reasonably foreseeable consequence of all three gang members repeatedly challenging victim with gang inquiries and engaging in a fistfight]; *People v. Ayala* (2010) 181 Cal.App.4th 1440, 1448-1453 [does not matter that assault did not go according to plan]; *People v. Gonzales* (2001) 87 Cal.App.4th 1, 10-11 [fatal shooting during gang-related fistfight was natural and probable consequence of fistfight]; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1375-1376 [defendant's punching of victim during gang confrontation foreseeably led to fatal shooting of victim by fellow gang member]; *People v. Godinez* (1992) 2 Cal.App.4th 492, 499–500 [fatal stabbing of rival gang member either during or after fistfight was natural and probable consequence of fistfight].)

It is also for the jury to determine whether *attempted* murder is a reasonably foreseeable consequence of a fight involving gang members.  (*People v. Caesar* (2008) 167 Cal.App.4th 1050, 1056-1058 [attempted murder conviction based on assault and battery as target offenses], disapproved on other grounds in *People v. Superior Court (Sparks)* (2010) 48 Cal.4th 1, 18; *People v. Hoang* (2006) 145 Cal.App.4th 264, 275-276

21

[attempted murder was natural and probable consequence of assault with a deadly weapon aided and abetted by gang member defendant]; *People v. Montes* (1999) 74 Cal.App.4th 1050, 1054-1056 [attempted murder by shooting of rival gang member during retreat from fight was natural and probable consequence of gang fight in which defendant wielded a chain]; *People v. Montano* (1979) 96 Cal.App.3d 221, 225-227 [defendant's aiding and encouragement of battery on rival gang victim foreseeably led to attempted murder of victim by fellow gang members], superseded by statute on other grounds as explained in *People v. Singleton* (1980) 112 Cal.App.3d 418, 424.) These murder and attempted murder cases logically apply in equal measure to count 3, discharging a firearm at an occupied motor vehicle.

The evidence in this record supports a conclusion that the charged offenses were natural and probable consequences of the target offenses. Defendant's fellow gang members and allies actively sought out their rivals. Hellside gang members were armed with firearms. As testified by the expert witness, gang "hit-ups" are invitations to violent confrontations. Defendant himself admitted that he knew things were going to get bad when he saw Hellside opening their trunks. There is evidence that the stakes were raised further when someone in defendant's group perceived that their rivals had firearms. The short car chase did not separate the fight from the shooting. Our Supreme Court has rejected the notion that a jury is required to draw fine distinctions between the fight itself and a flight from the fight that ends in murder: "although Vallejo argues that the fistfight and shooting were not one uninterrupted event, but rather two separate incidents, the evidence showed that [defendants] did not consider the fight to be over and that the shooting resulted directly from that fight." (*People v. Medina*, *supra*, 46 Cal.4th at pp. 919, 923-924 [affirming conviction].) Similarly, here the evidence suggests that the shooting occurred shortly after the parties entered their vehicles and drove out of the pool hall parking lot.

22

It must also be determined, however, whether there is substantial evidence supporting a direct aiding and abetting theory of liability for first degree murder. As noted above, we must reverse defendant's first degree murder conviction pursuant to *Chiu*, *supra*, 59 Cal.4th 155. In *Chiu*, the court approved of a disposition of the case by which the Court of Appeal reversed the first degree murder conviction, "allowing the People to accept a reduction of the conviction to second degree murder or to retry the greater offense." (*Id*. at p. 168.) In their supplemental briefs, the parties in this case both agree (without substantial discussion) that the same remedy should be imposed here. In our view, before doing so we must explicitly determine whether the evidence was sufficient to conclude defendant willfully, deliberately, and with premeditation intended to aid and abet the murder. Otherwise, double jeopardy principles would preclude retrying defendant for first degree murder on a direct aiding and abetting theory. (See *Burks v. United States* (1978) 437 U.S. 1, 11; *People v. Belton* (1979) 23 Cal.3d 516, 527 & fn. 13.)

Certainly, under the circumstances of this case, a direct aiding and abetting liability case was more difficult for the prosecutor to prove than a natural and probable consequences theory, which (pre-*Chiu*) could rely on the shooter's mental state to impose vicarious liability on defendant. (See *Chiu*, *supra*, 59 Cal.4th at p. 164.) But we conclude nonetheless that there is substantial evidence for the conclusion that defendant had the necessary mental state to be convicted of first degree murder under a direct aiding and abetting theory. The key facts supporting this conclusion are that (1) defendant knew his allies possessed firearms on the night in question, (2) defendant responded to calls for backup from his allies, (3) defendant observed his allies opening car trunks and defendant assumed they were retrieving firearms, and (4) with the knowledge of the foregoing facts, defendant participated in both the abandoned blockade of the pool hall exit and the car chase of the victims.

23

As for count 4, street terrorism, "[a]ny person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang, shall be punished by imprisonment . . . ." (§ 186.22, subd. (a).) Defendant's argument here is largely derivative of his claim that there is insufficient evidence to support his other convictions, which provided the basis for concluding that defendant willfully promoted, furthered, or assisted in any felonious criminal conduct by members of that gang. Defendant does not contest that he actively participated in Tiny Rascals or that he had knowledge of its pattern of criminal gang activity. The substantial evidence detailed above supporting defendant's convictions for first degree murder, attempted murder, and discharging a firearm at an occupied vehicle supports the street terrorism conviction. (See *People v. Castenada* (2000) 23 Cal.4th 743, 749-750 [violation of § 186.22, subd. (a), consists of aiding and abetting "separate felony offense committed by gang members"].)

*Street Gang Enhancements*

Defendant's 50 years to life sentence consists of 25 years to life for first degree murder (§ 190, subd. (a)) and a consecutive 25 years to life for the use of a handgun during the murder (§ 12022.53, subd. (d), (e)(1)). The court imposed additional punishments on the other counts and enhancements, but either ran the sentences concurrently or stayed them pursuant to section 654. As to the section 186.22, subdivision (b)(1)(C) allegations, which were found true by the jury, the court imposed a 10-year enhancement as to counts 1, 2, and 3. But the court stayed the execution of sentence on these enhancements pursuant to section 654.

Section 12022.53, subdivision (e)(2) states, "An enhancement for participation in a criminal street gang [pursuant to section 186.22] shall not be imposed on a person in addition to an enhancement imposed pursuant to this subdivision, unless

24

the person personally used or personally discharged a firearm in the commission of the offense." Obviously, defendant did not personally use or discharge a firearm in the commission of his offenses. The Attorney General concedes that the court erred by imposing, then staying, a 10-year prison term for each of the section 186.22, subdivision (b)(1)(C), enhancements to counts 1 through 3. We agree that defendant is entitled to the relief he seeks, namely, the striking of the 10-year enhancements imposed pursuant to section 186.22, subdivision (b)(1)(C). (See *People v. Brookfield* (2009) 47 Cal.4th 583, 596 ["what the trial court cannot do is to impose punishment under *both* section 186.22 and section 12022.53"].)

DISPOSITION

The first degree murder conviction is reversed. The People shall have the option to accept a reduction of the conviction to second degree murder or to retry the greater offense. The judgment is modified by striking the section 186.22, subdivision (b)(1)(C), enhancements imposed (then stayed) by the court as to counts 1, 2, and 3. The trial court is directed to prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

IKOLA, J.

WE CONCUR:

O'LEARY, P. J.

MOORE, J.

25